# Cuneo *v.* Philadelphia Transportation Company, Appellant.

Argued November 21, 1961. Before Bell, C. J., Musmanno, Jones, Cohen, Eagen and Alpern, JJ.

*Philip Price,* with him *Thomas C. McGrath, Jr., Bernard J. Smolens,* and *Barnes, Dechert, Price, Myers & Rhoads,* for appellant.

*Eli N. Donsky,* with him *Leon Katz,* and *Donsky and Katz,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 2, 1962.:

On December 2, 1959, at about 6:20 a.m., Mrs. Irene Cuneo, 65 years of age, descended from a streetcar of the Philadelphia Transportation Company at what is known as the "trolley loop" located at Richmond and Huntingdon Streets in Philadelphia. With a transfer in her hand she proceeded to cross two tracks at that point in order to reach another streetcar which was to take her to her place of employment. As she stepped in front of the car which was halted in front of the one from which she had disembarked, the latter car moved forward and struck her, inflicting serious injuries. In her ensuing suit against the Philadelphia Transportation Company the jury returned a verdict in her favor in the sum of $41,000. The defendant moved for judgment n.o.v. and a new trial. Both motions were refused by the court below and this appeal followed.

It is the contention of the defendant company that the plaintiff failed to prove negligence on the part of the company and that the plaintiff was herself guilty of contributory negligence. Neither contention is supported by the record. The locus in quo was a trolley loop made up of three tracks, which we will designate as tracks Nos. 1, 2 and 3. Mrs. Cuneo came into the loop on track No. 1 aboard a streetcar entitled Route No. 15. She was here required, as already stated, to

disembark so as to cross over to track No. 3, where she would board a car entitled Route No. 60. To reach track No. 3, she had to traverse tracks Nos. 1 and 2. Another Route 15 car had already stopped in front of the Route 15 car on which Mrs. Cuneo arrived.

The defendant argues that the plaintiff had "two perfectly safe ways to cross the track, one behind the leading car and the other far enough in front of it to be visible to the motorman before she stepped on the track or reached a position of danger."

The first "perfectly safe way" the defendant recommends might well be termed an invitation to suicide. To pass between two standing cars with the possibility that the leading car might back up or the second car might move forward, with an inevitable crushing of the passenger in between, would hardly be a method approved by any safety committee for crossing tracks.

The second "perfectly safe way" required the plaintiff to move a greater distance down the platform before crossing over so that, the defendant argues, she would be more visible to the motorman. But if the motorman did not see Mrs. Cuneo when she was within his immediate vision in front of his car, what assurance would there be that he would see her if she was farther away?

The plaintiff testified that she had taken one step into the track when she was hit. The motorman knew that passengers had disembarked from the car behind him; he knew that they crossed at the point where he had stopped. (The plaintiff testified she had been crossing here for eleven years.) The motorman's responsibilities demanded that he be extremely alert before starting up his car. The evidence shows and the verdict confirms that he was not alert. He did not ring his bell, he gave no other sign of warning before throwing on his power and plowing ahead.

The defendant dwells on the fact that the plaintiff was only 4 feet 7 inches tall and that the bottom of the window at the front of the car was 5 feet 5 inches above the ground. It argues from these measurements that the motorman could not see the plaintiff as she turned from the platform to the track. But if there is to be a comparison between the ways of avoiding an accident, it would be easier for the streetcar company to lower the window sill than for the plaintiff to grow taller. However, regardless of comparative heights, the motorman could unquestionably by leaning forward have seen the passenger stepping into the track. Moreover, a streetcar, like Noah's ark, must accept all species, sizes and shapes of passengers. A streetcar company has the same responsibility toward dwarfs as it has toward giants. Certainly it could not be argued that there would be any lessening of responsibility on the part of a motorman toward looking out for a child on account of its diminutive size.

The defendant argues, however, that the plaintiff should not have crossed at this point at all. Orange and yellow lines five or six feet apart crossed No. 1 track. The leading car was stopped behind these lines. The appellant maintains that the painted lines indicated the point at which the cars were to stop and not where the passengers were to cross. If this point was not an established place for crossing, where were the passengers to cross? The passengers had to get from track No. 1 to track No. 3 some way. If the traction company didn't lay down the pedestrian route across the tracks, the necessities of the situation demanded that the passengers find their own way. What is dictated by necessity is as authoritative in the routine of life as what is laid down by formal regulation and proclamation. The motorman involved in this case testified that it was customary for passengers to cross at the point used by Mrs. Cuneo.

The defendant argues in its brief that the motorman was not required to anticipate that the plaintiff would "duck in front of his car." One cannot avoid responsibility in any given instance by responding formidably to a given set of facts which do not exist. There is no evidence that the plaintiff ducked in front of the streetcar. To "duck" suggests a rapid and impulsive movement. The plaintiff did not "duck." She testified that she "walked" in front of the car. To walk is not to duck.

We are satisfied that the jury was warranted in finding that the defendant company was negligent. It owed to Mrs. Cuneo the same degree of care imposed on it by law toward passengers actually aboard its cars. That care it did not discharge. " 'The weight of authority is to the effect, when a passenger who is making a continuous journey alights from a streetcar for the purpose of making a transfer, the relation of the carrier and passenger continues while he is in the necessary act of making the transfer and the carrier owes to him the same high degree of care which it owes to passengers on board its cars.' " (*Damm v. East Penn Transportation Co.,* 120 Pa. Superior Ct. 381.)

"[A] carrier's duty to a passenger is the exercise of the highest care as long as the relationship subsists, from the time the person becomes a passenger until his status as such ceases and he has completed his journey and left the carrier's premises." (10 Am. Jur., Carriers, §1249).

It is also clear that the jury was justified in its conclusion that the plaintiff was not guilty of contributory negligence.

At the time of the accident the plaintiff was 65 years of age. The appellant's argument for a new trial on the basis of an excessive verdict is predicated mostly on this fact. It points out that Mrs. Cuneo is eligible for social security payments and thus could not

have been expected to continue working for the remainder of her life expectancy, even if she had not been injured.

It is a mistaken assumption that because one is eligible to social security benefits at 65, this age represents the end of the line for productive work on the part of the average person. Longevity is not so rare in modern life that it must be dismissed as bizarre. The advances made in medical science, the widely publicized rules of health and better living have all contributed to a constantly increasing life span which one has the right to enjoy free of pain and suffering caused by tortious happenings. Therefore, it is error to say that at 65 one can no longer work remuneratively and therefore must be cast on the economic ash heap.

There is no reason dogmatically to assume that, given reasonable health, one cannot for some years continue as efficiently after the 65th milestone has been reached as for the few years which preceded that heretofore awesome marker. The ripened experience, the matured intellect, the self-control, the storehouse of knowledge gathered through the years all so contribute to the efficiency of the human mechanism that it may continue to produce after 65 years with an effectiveness that no employer or society at large should want unthinkingly to discard.

Judge WATERS of the Court of Common Pleas of Philadelphia County has excellently summed up why the Court below did not believe the verdict of $41,000 to be excessive and we adopt that part of his opinion as reason for affirming the court's refusal of a new trial in this feature of the case. "The defendant's final contention is that the verdict was excessive. The plaintiff was hospitalized for ninety days. She sustained a comminuted fracture of the right femur intertrochanteric, which ultimately resulted in a one-inch shortening of the right leg. X-ray measurements

showed a 1-5/8″ shortening of the right leg. The plaintiff was operated on on December 16, 1959, and the fracture was reduced by affixing a metal plate at the fracture site. Because the plate was not properly placed she was again operated on on December 21, 1959, and the location of the plate was corrected. After the plaintiff was discharged from the hospital she became a patient at a nursing home for an additional 46 days. The plaintiff's injury resulted in a permanent shortening of the leg, with a *non-union* of the fracture and an inability to walk without a pronounced limp. She cannot walk without support. The plaintiff's evidence established a basis on which the jury could conclude that she was totally and permanently disabled. Dr. Irvin Stein examined plaintiff on behalf of the defendant but was *not* called to testify.

"At the time of the accident, the plaintiff was employed as a machine operator in the tag division of Reyburn Manufacturing Company at a weekly wage of $58.95. For 1957 her total earnings were $2,708.33, for 1958 they were $2,938.31 and for 1959, up to the date of the accident, she earned $3,023.29. The plaintiff has not worked since the accident and her physician testified that she is unable to do any work that requires walking or standing.

"The hospital and doctor bills in this case amounted to $3,253.10; the lost wages to the date of trial approximated $3,800 or a total of $7,000 in special damages. The jury had the further duty of evaluating the impairment of plaintiff's earning capacity during a possible life-expectancy of fourteen years. How long she would have continued to work was for the jury to decide. The defendant's suggestion that plaintiff's employer went out of business in December 1960, and that she would probably not have gotten other employment at the age of 66 years is quite inappropriate; it improperly extracts an inference in defendant's favor and

it confuses the fact that it is earning capacity which is measured not actual job experience.

"The jury also had the duty to consider and evaluate the pain, inconvenience and suffering which plaintiff had to the time of trial and for the balance of her lifetime. The plaintiff, because of the non-union of her fractures, also requires future treatment, hospitalization and reconstructive surgery. The plaintiff's counsel in his brief asked '. . . how much for being changed from a useful, working and productive member of society into a semi-invalid. . . ?' That question was for the jury and we certainly were not shocked at its verdict. The verdict was fair and just compensation."

Judgment affirmed.

---

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

The jury's verdict in awarding, and the Opinion of this Court in sustaining damages of $41,000 to a 65 year old woman based to a large degree on a work expectancy of 14 more years, is so unfair and unrealistic as to necessitate a substantial reduction. I would grant a new trial limited to the question of damages.

Mr. Justice BENJAMIN R. JONES joins in this dissenting opinion.