Reid Laurence **FELDMAN**, personally and as Administrator of the Estate of Nancy Hollander Feldman, Deceased

v.

**ALLEGHENY AIRLINES, INC.**
Civ. No. 15670.

United States District Court,
D. Connecticut.

Aug. 2, 1974.

Peter B. Cooper, New Haven, Conn., for plaintiff; John W. Douglas, G. R. Poehner, Washington, D. C., of counsel.

William R. Moller, Hartford, Conn., for defendant.

## MEMORANDUM OF DECISION

BLUMENFELD, District Judge.

This is a wrongful death action arising under Conn.Gen.Stats. § 52–555 which was brought by the surviving husband as administrator of the estate of Nancy Hollander Feldman,[1] who was killed in the crash of Allegheny Airline's Flight 485 on the morning of June 7, 1971, near New Haven, Connecticut. Allegheny having stipulated to its responsibility for Mrs. Feldman's death, and the plaintiff having reciprocally waived any claim to punitive damages, trial was had to the Court on the issue of damages. Assessment of damages for the death of Mrs. Feldman requires consideration of several factors.

### I.

The pattern of the decedent's life was still evolving at the time of her death and must be described in some detail in order to demonstrate the bases for the Court's conclusions as to what course her life would probably have taken in the future.

### College Years

Nancy Hollander was reared in a Maryland suburb of Washington, D.C., and entered the University of Pennsylvania as a freshman in 1964. Her grades in college rose steadily from a "C" average as a freshman to "B" and "B+" averages in her upper division years, leaving her with a cumulative "B" average of 2.94 on a scale of "A" = 4. She was the recipient of a Department of Justice scholarship throughout college, and was active in student government. She was also involved in the nether reaches of the federal government for four successive summers during her college years. She began as a secretary for the National Institutes of Health in 1964, and spent the next three summers in the Office of the Solicitor of the Department of Labor, rising from legal secretary to research assistant to budget analyst by the summer of 1967. Shortly after receiving her Bachelor of Arts degree in English Literature in May of 1968, she married the plaintiff and accompanied him that fall to New Haven, Connecticut, where he commenced studies at the Yale Law School.

### Ante-Mortem Employment

Mrs. Feldman's employment in New Haven reflected a continuing interest in and ability to obtain work relating to governmental functions and processes. After some temporary secretarial jobs she secured a position as a research assistant with the New Haven Legal Aid Association. Her principal task there was development of a cost-benefit analysis of the Association's operations. She also performed para-legal research work,

1. Prior to filing the complaint herein the plaintiff had been appointed personal representative of the estate of the decedent by order of the Circuit Court of Montgomery County, Maryland, sitting as the Orphan's Court for that county. Pursuant to the Court's suggestion, and without objection by the defendant, the plaintiff during the course of the trial applied to the Connecticut courts for appointment as Ancillary Administrator in Connecticut of the estate of Nancy Hollander Feldman. Such an appointment was duly ordered by the Probate Court of Hartford County on May 6, 1974, and by agreement of the parties and the Court this appointment was entered in evidence before the Court and the complaint was amended to reflect the plaintiff's appointment as Ancillary Administrator in Connecticut of the estate of Nancy Hollander Feldman.

such as preparing studies of residents of New Haven neighborhoods when such data was pertinent to litigation being conducted by the Association. The following summer of 1969 she worked for the Equal Employment Opportunities Commission in Washington. In September of 1969 she joined the urban affairs consulting firm of Cogen, Holt & Associates (Cogen, Holt) as a professional associate, and remained in this position until her death.

Cogen, Holt had been formed in 1968 by, among others, Joel Cogen, formerly General Counsel to the New Haven Redevelopment Agency. When the decedent became associated with the firm in 1969, it had a total staff of about ten persons, and has since nearly tripled in size. Clients include Yale-New Haven Hospital, the Yale School of Medicine, private foundations, and public housing and redevelopment authorities. In addition the firm provides complete staff services for the Connecticut Conference of Mayors and Municipalities, an organization representing cities and towns before Congress, the state legislature, and state and federal administrative agencies, acting basically as a lobbyist for municipal interests.

Mrs. Feldman's work with Cogen, Holt involved her principally with the Conference of Mayors. She began as a legislative analyst doing research for other members of the firm, but as she acquired experience she worked more directly with the client and with the targets of the client's lobbying. In the words of Mr. Cogen, who himself serves as Executive Director of the Conference, "there was this thread of research analysis administrative work that gradually increased in the responsibility and, in fact, in exposure to the public. It was in the closing days of her work for us that she had become increasingly involved in highly complex legislation and, in fact, at the very end was working very closely with the legislators, members of the General Assembly, and indeed was doing direct lobbying at the State Capitol in the last days she worked for us."[2]

Her interest in her work was intense; she worked hard and enthusiastically and genuinely impressed her employers. Mrs. Kathryn Feidelson, another partner in Cogen, Holt who worked with the decedent on projects for the Conference of Mayors, testified that she had "a remarkable degree of analytic ability, a skill in using numbers, statistical analysis. But apart from the intellectual skills she had personal skills which made her able to deal with a wide variety of people, as well as administrative skills, a thorough commitment, a sense of responsibility, a talent for following up projects in which she was working."[3]

Mr. Clarence Heimann, currently Director of Project Development for the Connecticut Resources Recovery Authority, was First Selectman for Trumbull, Connecticut, for the twelve years from 1961 to 1973. He was president of the Connecticut Conference of Mayors and Municipalities in 1971 and 1972, and was vice-president of that organization in 1970. In these capacities he dealt directly with the decedent. He was "very much impressed" with her abilities: "I would describe her as being an attractive and intelligent and articulate person; someone who had the ability to order her thoughts and to be able to present them in a fashion that people could readily understand. She had a unique ability, in my opinion, in this area. As a relatively young person she seemed far more mature than her age in her ability to engender thinking and to encourage participation by people who were, in many cases, her superior in age and perhaps station in life."[4]

The circumstances leading to Mrs. Feldman's death are illustrative of her commitment to her work. She and her husband having both grown up in the metropolitan Washington area, they had

2. Reporter's Transcript (R.T.) at 95.

3. R.T. at 117–118.

4. R.T. at 161.

determined to settle there. She had accordingly arranged to leave Cogen, Holt for what she anticipated would be similar employment in Washington, and had begun exploring opportunities in Washington for employment as a legislative analyst. For instance, she had approached a representative of the United States Conference of Mayors who was attending the annual meeting of the Connecticut Conference of Mayors, and had gained an optimistic impression of her chances of employment with the United States Conference of Mayors. She also had an alternative field of endeavor open to her, since she had applied to and been accepted by the George Washington University Law School for admission in the fall of 1971. Her husband having finished law school, she drove with him and their belongings to Washington on the first weekend in June 1971, as he was about to take the District of Columbia bar examination. But her contribution to Cogen, Holt had become significant enough for her presence there to be required for one last week, notwithstanding her change of residence. In Mr. Cogen's words, "we had three days left in the [legislative] session and she was handling some very crucial legislation on which she had done the research, analysis, the drafting, and she had close contacts with the key legislators on those bills and we needed her back because it was essential to get those bills passed." [5] Mrs. Feldman accordingly embarked on Allegheny's morning flight to New Haven on the Monday after the couple's move to Washington.

### Ante-Mortem Earnings

The decedent's earnings durng her years in New Haven corroborate her employers' testimony as to her professional competence and her bright prospects for employment and advancement in the Washington millieu. During the approximately nine months she worked for New Haven Legal Assistance, she earned $5,054.62, which reflects an annual rate of approximately $6,700. Her summer job with the EEOC in 1969 earned her $991.71, and various other odd jobs brought her total earnings for the year beginning September 1968 to $6,544.33. Her starting salary in September 1969 at Cogen, Holt was $6,500. Her salary was increased to $7,500 in May 1970, to $9,000 in November 1970, and finally to $10,000 in May 1971. In just 20 months at Cogen, Holt her salary thus rose by 54 per cent. Mr. Cogen stated that had she remained at Cogen, Holt the decedent would have continued to receive annual raises of at least $1,000 per year and possibly substantially more to reflect cost of living increases. For example, the young woman hired to replace Mrs. Feldman began at $10,000 per year but was given an increase to $13,500 about one year later.

## II

At the time of her death the decedent had not accepted nor even formally applied for employment in Washington. Her record justifies her apparent confidence that she could easily find suitable employment in Washington once she was finished with her work at Cogen, Holt, her husband was through the bar examination, and they had had a brief vacation. And, of course, her having won admission to law school provided a stimulating and ultimately profitable alternative to immediate continuation of her career as a legislative analyst, should the job market have proved less fertile than she imagined. While predictions as to the precise course her future career would have taken may not be made with certainty, the Court has not the slightest doubt that the qualities of intelligence, aggressiveness, enthusiasm, and tenacity which she demonstrated in her working life would have carried her far, especially in view of the fact that she was pursuing a career in and about the federal government at the very time when the equalization of career opportu-

5. R.T. at 95.

nities for women was emerging as a major federal policy.

### Evidence of Employment Opportunities

The possibilities which lay open before Mrs. Feldman in June of 1971 are illustrated by the remarkable ascent in the career of Mr. Steven Bourke, who entered the Washington governmental job market at the same time as and with remarkably similar credentials to the decedent's. Mr. Bourke testified that he joined Cogen, Holt in the late summer or early fall of 1968, just after the firm's inception, at a starting salary of $6,000 per year. By the time he left Cogen, Holt 34 months later to take a job in Washington, his salary had risen to $13,500. The job he took in Washington in the summer of 1971 was as a legislative analyst for the Committee on Public Works of the House of Representatives, and paid $17,500 annually. He later took a position on the staff of the Chairman of the Public Works Committee at $20,000 annually. In this capacity he was offered a salary of $34,000 per year if he would agree to remain in that position as a permanent professional staff assistant. He declined this offer, however, and instead became, in the fall of 1973, one of two analysts of national legislation reporting directly to the Speaker of the House. In this new capacity as the Assistant Director of the House Democratic Steering and Policy Committee, Mr. Bourke earns an annual salary of $30,000 at the age of 28.

Mr. Bourke entered on his career upon graduating from college in the same year, 1968, with the same degree, a Bachelor of Arts, in the same subject, English Literature, with the same average, just below a "B" overall, as did the decedent. The only educational distinction is of no significance: Mr. Bourke graduated from Yale, Mrs. Feldman from Pennsylvania. While each institution no doubt has its chauvinistic proponents, the Court need make no judgment as to the relative merit of the educational opportunities afforded by either. It suffices to take judicial notice that the educational programs of the two are sufficiently similar for them to be commonly grouped together as members of the elite "Ivy League." Any difference in prestige or "market value" between degrees from the two schools is deemed by the Court to be *de minimis*, especially in terms of an employer's ultimate decision to hire a given applicant for a given job.

In addition to their similar educational credentials, Mr. Bourke and Mrs. Feldman brought almost identical on-the-job experience to the Washington job market. Like the decedent, Mr. Bourke performed legislative analysis for Cogen, Holt, and indeed spent half his time with Cogen, Holt working on legislation for the Connecticut Conference of Mayors and Municipalities. The only discernible difference between their experiences at Cogen, Holt was Mr. Bourke's additional year of employment there, Mr. Bourke having joined the firm directly out of college while Mrs. Feldman spent her first post-graduate year with the New Haven Legal Aid Association.

Mr. Bourke himself felt that Mrs. Feldman's qualifications for work in the legislative field "were virtually the same" as his own when in June of 1971 they were both considering seeking work in Washington.[6] He personally had no trouble getting a job in Washington as a legislative analyst, since Cogen, Holt had provided him with "excellent background and training for that sort of work."[7] Indeed, when Mr. Bourke first went to Washington he was offered, but declined, a $20,000-a-year job as legislative counsel for the National League of Cities and United States Conference of Mayors (NLC/USCM), the national counterpart of the Connecticut Conference of Mayors and Municipalities.

Mrs. Feldman's job prospects in Washington were further explored by plaintiff through the deposed testimony

---

6. R.T. at 129.

7. R.T. at 130.

of Mrs. Dorothy Rodmann, the manager of the personnel department of NLC/USCM, an organization of about 250 employees of whom about 20 are engaged in legislative analysis. This organization adheres directly to the federal government's "General Schedule" (GS) of civil service salaries, in recognition of the federal government's leadership in setting pay scales for professionals in the District of Columbia area. NLC/USCM employs legislative analysts at salaries equivalent to GS-10 through GS-14.

A Program and Legislative Research Assistant at NLC/USCM is a GS-10, which in 1971 encompassed an annual salary range of $11,517 to $14,973. Such a job bears the general description:

> "To assist the Federal Legislative Representative in a highly responsible manner in the performance of indepth research and analysis and the performance of certain essential and time-consuming routine duties; enabling the Federal Legislative Representative to give primary attention to accomplishing the cities' federal legislative goals, securing federal grant assistance, and assisting city officials as necessary on Washington visits."[8]

An Associate Counsel in Mrs. Rodmann's organization is a GS-11, who in 1971 was paid a salary of $12,615 to $16,404. This position is described by NLS/USCM as:

> "Work with federal agencies, the U.S. Congress, local governments and public and special interest groups to develop and implement NLC and USCM policy positions. Work with state municipal leagues and provide staff assistance to NCL USCM policy commit-

tees. Develop analytical materials as a result of these activities for dissemination through NLC and USCM."[9]

Finally, the position of Counsel with NLC/USCM rates a salary level of GS-12 through GS-14, which in 1971 covered a range of $15,040 to $27,061. The duties of this position are described as:

> "Work with the U.S. Congress, agencies of the Federal Government, municipal governments, public and special interest groups, and other interested parties; to develop and implement policy positions of the National League of Cities [and] the U.S. Conference of Mayors. To relate different work as required by the NLC USCM, and the Director of Congressional Relations. Develop working relationships with members of Congress and staff for the purpose of securing legislative implementation of the policy positions of the National League of Cities and the U.S. Conference of Mayors. Work with state municipal leagues. Staff assign policy committees of the National League of Cities and U. S. Conference of Mayors."[10]

Based on the decedent's résumé,[11] Mrs. Rodman expressed the opinion that Mrs. Feldman would have been qualified in 1971 for a GS-10 position in the NLC/USCM legislative research program, at a starting annual salary of $11,517. Mrs. Rodmann also testified that a person such as Mrs. Feldman who had worked for the Connecticut Conference of Mayors would be in an advantageous position in seeking employment through her with NLC/USCM. "I think, certainly, in our organization that it is an advantage to have someone with working experience in local government and most particularly with one of our counterparts at the local level."[12]

---

8. Reporter's Transcript of deposition of Dorothy P. Rodmann, April 11, 1974 (D.T.), at 16–17.

9. D.T. at 17.

10. D.T. at 18.

11. At the time of her death, Mrs. Feldman had not yet prepared an updated résumé

for use in seeking employment in Washington. Mrs. Rodmann was given the decedent's 1969 résumé and a hypothetical résumé reflecting the decedent's additional job experience at Cogen, Holt. *See* page 1284, *infra*.

12. D.T. at 19.

Additional evidence of the decedent's job prospects came from several sources. Mr. Cogen of Cogen, Holt was familiar with Washington employment opportunities in the field of legislative analysis through his occasional business trips to Washington as Executive Director of the Connecticut Conference of Mayors and Municipalities and as a member of the Board of Directors of NLC/USCM. He testified that there were far more opportunities for employment in legislative analysis in Washington than in Connecticut, at much higher salary levels. He would have given Mrs. Feldman a "strong recommendation" for a position at NLC/USCM, comparing her "very favorably" to others in her field.[13] Mr. Cogen was familiar with the position of legislative counsel at NLC/USCM and felt the decedent was qualified for this position, at the lower salary range provided for that position.

Mrs. Feidelson, also a partner in Cogen, Holt, and Assistant Director of the Connecticut Conference of Mayors and Municipalities, testified that she would have given the decedent "a strong and very good recommendation" for another professional job in the field of legislative analysis.[14] Mrs. Feidelson had had a discussion with Mrs. Feldman about the decedent's career plans just a week or ten days before her death. "I remember it rather clearly because we were riding up to Hartford together to work at the General Assembly and we discussed this subject specifically. She indicated to me that she wanted to pursue a career, that she at the same time was interested in having a family and thought that she might take time out for that family, but that she would always return to a job. She was for that

reason rather interested in the way my career had gone because I, too, had had a family, had taken time out and had returned to work. So there were certain analogies."[15]

Mrs. Feidelson's own career does indeed suggest the feasibility of the decedent's hoped-for combination of pursuing a professional career while raising a family. Mrs. Feidelson has three children, whose current ages range from 26 to 19. After receiving a Bachelor of Arts degree from Vassar in 1947, Mrs. Feidelson worked until 1948 and then did not work until 1962, when she took a job with the New Haven Redevelopment Agency. She started working full time for Cogen, Holt in 1969, at a salary of $10,200, which had risen to $21,000 by 1972. She became a partner in that year, and in that capacity earned approximately $30,000 in 1973.

Mr. Heimann, the former First Selectman of Trumbull, testified that the decedent had had "a very fine future" in the field of legislative analysis,[16] and that in his capacity as chief executive of the town of Trumbull, he would have employed her any time she might have chosen to leave Cogen, Holt. In the summer of 1971 such employment in the municipal government of Trumbull would have carried a salary of between $9,000 and $10,000 per year.

The defendant produced just one witness on the subject of the decedent's employment prospects. Mrs. Diana Donald is a partner in an urban planning consulting firm based in Farmington, Connecticut, and engaged in projects throughout Connecticut.[17] Her firm currently has 12 partners and employees and has varied in size from half that to

---

13. R.T. at 99.

14. R.T. at 120.

15. R.T. at 118.

16. R.T. at 161.

17. Her firm, while similar to Cogen, Holt in some respects, is essentially a planning firm, and thus she recognized a difference in their orientation; nonetheless their work tends to

overlap insofar as planning does involve research into and coordination with federal and state legislative policies. Her firm pays salaries which are competitive with other such firms in Connecticut. The numbers of positions available with such firms has declined somewhat over the last five to six years, however, due to a reduction in federal aid for municipal planning and related activities.

twice that. The professional staff is composed primarily of "planners," who are directly responsible for projects; "research associates" or "research assistants" are also employed on occasion to assist the planners. Six or seven such assistants have been employed during the ten years the firm has been in existence. The qualifications required for the job are a Bachelor's degree and the ability to do responsible work under supervision. The last such assistant hired was a woman who had just received a B.A. from Smith College. She joined the firm in 1969 at a $6,500 salary and was making $7,020 per year when she left somewhat more than a year later. The firm's planners who are not partners currently make from $10,000 to $16,000 annually. One of the firm's current nonpartner planners is a woman who joined the firm as a research assistant with a Bachelor's degree. After seven years with the firm she is now a planner and makes $15,000 per year. Mrs. Donald herself has a $16,000 annual salary plus a share in the firm's profits which amounted to $6,000 in 1973.[18]

Mrs. Donald did not feel that her being a woman had handicapped her in her profession. She has had two children, now aged 10 and 12, during her 14-year career. She took six months off after the birth of her first child, then worked part-time for 18 months until the birth of her second child. After this birth she returned to work full time.

### III

*Measure of Damages for Destruction of Earning Capacity*

 Connecticut law, which is controlling in this diversity case brought in Connecticut on a cause of action which arose in Connecticut, see, *e. g.,* Erie v. Thompkins, 304 U.S. 64, 58 S.Ct. 817, 82

L.Ed. 1188 (1938); Patch v. Stanley Works, 448 F.2d 483, 487 (2d Cir. 1971), sets forth a measure of damages for wrongful death which makes the loss of future earning capacity a major, but not the exclusive element of recovery. As was stated in Connecticut's leading case on the subject, Floyd v. Fruit Industries, Inc., 144 Conn. 659, 669–670, 671, 136 A.2d 918, 924, 925 (1957):

"Damages for wrongful death, as such, are allowed as compensation for the destruction of the decedent's capacity to carry on life's activities, including his capacity to earn money, as he would have if he had not been killed. [Citation omitted.] In the case of one who is gainfully employed, especially one who earns a relatively large income, . . . the destruction of earning capacity may well be the principal element of recovery resulting from the death. . . .

"[D]amages for wrongful death, under the basic survivorship theory of our law, are assessed on the basis of the loss to the decedent had he lived, and, except in that sense, not on the basis of loss to his estate. It follows that in many respects damages are assessed in the same way as in a nonfatal case involving a total and permanent destruction of the capacity to carry on life's activities. . . .

"When destruction of earning capacity, that is, the capacity to carry on the particular activity of earning money, is to be compensated for, the inquiry in the first instance is as to probable net earnings, in the ordinary sense of that phrase as used in accounting practice, during the probable lifetime."

The Court's first task in the instant case is thus to assess Mrs. Feldman's capacity or capability to engage in gainful employment at the time of her death and throughout the rest of her working life,

---

18. Mrs. Donald is active in the national affairs of the American Institute of Planners. She testified that the Executive Director of this organization, which is based in Washington, makes $30,000 per year. He is 41 or 42 years of age, and was first a city planner, then an assistant director of NLC/USCM before becoming the administrative head of the American Institute of Planners.

and to estimate the "probable net earnings" which the decedent would have accrued had her opportunity to realize income from her employment capability not been destroyed by the defendant's admitted negligence.

In discharging this task, the Court is mindful that "[t]he whole problem of assessing damages for wrongful death . . . defies any precise mathematical computation." Floyd v. Fruit Industries, Inc., *supra*, 144 Conn. at 675, 136 A.2d at 927. However, unlike a jury, the Court feels under an obligation to give a reasoned account of the facts and the law which lead it to resolve in a particular fashion a controversy submitted to it by the parties. When the parties waive their rights to a jury trial and rest their fortunes with one person instead of six or twelve, they are entitled to some indication of how that solitary trier of fact has viewed the evidence. And, since no instructions to the jury are in the record to establish the Court's view of the law, a detailed memorandum of decision is essential to preserve a meaningful opportunity for appellate review of the Court's decision. Accordingly, the Court has provided for the benefit of the parties in this case a comprehensive recitation of the findings, assumptions, computations, and conclusions by which it has arrived at its decision herein. This should not be taken as betokening a lack of appreciation by the Court that the task before it defies reduction to ultimate detail. In dealing with "the familiar elements of permissible damages in death cases," the Court has maintained the perspective mandated by the Connecticut Supreme Court: "Suffice it to say that, except for the special expenses allowable under the statute, all these elements are, of necessity, imponderable and largely speculative. No one can place a definite value upon them, nor can one do more than conjecture as to what the future course of any life, if continued, would have been. At best, the trier must take the evidence and make an intelligent esti-

mate." Fairbanks v. State, 143 Conn. 653, 659, 124 A.2d 893, 897 (1956).

Returning to the immediate task at hand, it must be emphasized that compensation is based on the loss of earning *capacity*, not future earnings per se. See Morrison v. State, 516 P.2d 402, 404–405 (Alaska 1973). See also the cases collected at 25 C.J.S. Damages § 40, at 727–728, nn. 60–63 (1966); Annotation, 151 A.L.R. 479, 494–495, nn. 36–38 (1944). The Court's duty is to evaluate the financial worth of lost earning capacity, or "net earning power." McKirdy v. Cascio, 142 Conn. 80, 86, 111 A.2d 555 (1955). This involves "an inquiry into the value of the person's capacity to earn money by his labor, physical or intellectual." Davis v. P. Gambardella & Son Cheese Corporation, 147 Conn. 365, 370, 161 A.2d 583, 586 (1960). The past earnings of a salaried person are "merely evidence in aid of the establishment of the value of the earning capacity and do not, in themselves, fix the value." *Id.*

Since earning capacity, and not earnings themselves, is the measure of damages, the Court is only indirectly concerned with whether the decedent would in fact have utilized her earning power at any given time so as to produce actual income. In our society one is free, within the constraints of the need for self-sustenance, to do with one's time as one wishes. While many thus spend their time in essentially nonremunerative familial, intellectual, aesthetic, or athletic pursuits, this does not mean that their time is economically valueless. Even if one lacks any significant earning capacity, one obviously places a value on one's capacity to carry on life's activities, and the destruction of this more general capacity is compensable under Connecticut law. Chase v. Fitzgerald, 132 Conn. 461, 470, 45 A.2d 789 (1946); Floyd v. Fruit Industries, Inc., *supra*, 144 Conn. at 670, 136 A.2d 918. When a person who does possess significant earning capacity chooses, as is her right, to forego remunerative em-

ployment in order to follow other pursuits, such as child-rearing, that person manifestly values those pursuits at least as highly as the sacrificed remuneration, and the loss through wrongful death [19] of the opportunity to engage in non-remunerative occupations may thus fairly be measured by reference to the earning capacity possessed by the decedent.

It is, however, necessary to make a reasonable estimate as to the course the decedent's life would have taken throughout her working years, in order accurately to assess her capacity to earn money at any given point in time. Earning capacity is an organic concept, as mutable as life itself. The probable objectives of the decedent in her career and her progress towards realizing them are material to estimation of the job skills she would have acquired and maintained over time. These job skills in turn govern, in terms of their probable economic value, the year-by-year monetary worth of the decedent's capacity to earn money.

*Basic Findings Regarding Decedent's Earning Capacity*

■ It is hardly speculative to conclude that the decedent could have secured employment in Washington as a legislative analyst. Mr. Bourke's ease in obtaining such employment demonstrates that job opportunities abounded for persons with the interests, abilities, qualifications, recommendations, and motivation of the decedent. This is especially so with respect to positions within NLC/USCM, which organization was obviously impressed with the substantially similar qualifications of Mr. Bourke, and within whose councils Mrs. Feldman could rely on the favorable support of Messrs. Cogen and Heimann.

Less certain is the conclusion that Mrs. Feldman would in fact have accepted such employment in preference to enrolling in law school. The Court believes the addition of a law degree to Mrs. Feldman's qualifications could only have increased the prima facie value of her job skills and her determination to hone those skills through a professional career. Thus the Court's conclusion that she would probably have eschewed law school in favor of immediate employment as a legislative analyst, represents an election of the more conservative alternative in terms of her net lifetime earning capacity.

Turning to the finding on which is based the valuation of the decedent's initial earning capacity as a legislative analyst in Washington, the probabilities established by the evidence adduced at trial point to the decedent's having accepted such employment with NLC/USCM. The decedent had expressed to a national representative her interest in working for NLC/USCM, and had been given grounds for optimism in that regard. Mr. Cogen, the Executive Director of the Connecticut Conference of Mayors and Municipalities and a member of the Board of Directors of NLC/USCM, was prepared to give her a strong recommendation, as was Mr. Heimann, the President of the Connecticut Conference of Mayors. Mrs. Rodmann, head of NLC/USCM's Personnel Department, stated that the decedent's experience with the Connecticut Conference of Mayors would have given her an advantage in seeking employment with NLC/USCM. And finally, Mr. Bourke, with a year longer at Cogen, Holt but otherwise similar qualifications, received a job offer from NLC/USCM during the very summer in which the decedent would have been seeking a job.

Mrs. Rodmann felt that the decedent would have qualified for a GS-10 posi-

---

19. It should be emphasized that the Court is here confronted by a wrongful death action rather than a personal injury action, wherein the injured person might have lost her earning capacity but not her capacity for at least some non-remunerative pursuits. In such a personal injury context, it might well be relevant to ascertain the extent to which the injured party would in fact have employed her lost earning capacity rather than follow the non-remunerative pursuits not foreclosed to her by her injury.

tion as a legislative researcher at NLC/USCM, with a starting salary of $11,517 per year. However, this assessment of the decedent's qualifications was based solely upon Mrs. Rodmann's review of two documents. See note 11, *supra.* The first of these documents was a one-page résumé prepared by Mrs. Feldman when she was still with the New Haven Legal Assistance Association, before joining Cogen, Holt. The second was a hypothetical résumé prepared by Mrs. Feidelson of Cogen, Holt after Mrs. Feldman's death, consisting of a one-page recitation of Mrs. Feldman's qualifications in standard résumé form, attached to which were 19 pages of copies of reports and memoranda prepared by Mrs. Feldman in the course of her employment at Cogen, Holt. Although perhaps reasonable in view of the limited basis for her appraisal of the decedent, Mrs. Rodmann's conclusion at the time of her deposition that Mrs. Feldman was qualified only as a GS–10 was unduly conservative from the perspective of the more complete evidence before the Court. As set forth previously, see page 1279, *supra,* the NLC/USCM GS–10 job of "Program and Legislative Research Assistant" is described as entailing basically a research function, with actual lobbying reserved for the "Federal Legislative Representative" for whom the research assistant works. This is just the sort of work the decedent performed initially at Cogen, Holt. Evidence not before Mrs. Rodmann but before this Court establishes that Mrs. Feldman had assumed direct lobbying and client contact responsibilities at Cogen, Holt by the time of her death. Her responsibilities at Cogen, Holt—the very responsibilities which mandated her ill-fated return to New Haven—were more akin to those attributed by NLC/USCM to the GS–12 position of legislative Counsel, whose duties include the development of "working relationships with members of Congress and staff for the purpose of securing legislative implementation of the policy positions of the National League of Cities and the U. S. Conference of Mayors." See p. 1279 *supra.*

The Court's conclusion that the decedent would have been hired by NLC/USCM as a GS–12 rather than a GS–10 is supported by the testimony of Messrs. Cogen and Bourke. Mr. Cogen opined that Mrs. Feldman was qualified for the position of legislative Counsel with NLC/USCM, at the lower end of the salary range for that position. Mrs. Rodmann testified that the legislative Counsel position carried a GS–12 to GS–14 salary. Mr. Bourke was himself offered a position with NLC as legislative Counsel at $20,000 per year. This was an advanced GS–13 salary on the 1971 GS scale, just below the lowest salary step at the GS–14 level. It accordingly is reasonable to conclude that Mrs. Feldman, with substantially the same qualifications as Mr. Bourke save for one year less experience with Cogen, Holt, would have warranted at least the lowest GS–12 salary of $15,040 per year. Indeed, in view of the salary offered to Mr. Bourke this seems a conservative estimate.

Before moving on to an assessment of the probable increase in earning capacity which Mrs. Feldman would have experienced during her working life, a word is appropriate on the extent to which the decedent's course in life can fairly be compared to the considerable success in the same sort of work enjoyed to date by Mr. Bourke. Obviously Mr. Bourke possesses intangible qualities which have assisted his professional advancement, qualities which may well distinguish him significantly from the decedent despite the rather striking analogies between their formal qualifications. It is impossible to reconstruct the decedent's personality from the bare record of this case with sufficient precision to allow a completely accurate comparison with Mr. Bourke. Mrs. Feldman possessed intelligence, self-confidence, and skill in inter-personal relationships. How far these valuable qualities would have car-

ried the decedent cannot be established with certainty.

It would thus hardly be fair to attribute to the decedent the same accelerated rise in her profession experienced by Mr. Bourke. But neither can it be ignored that the decedent, if not likely to have progressed step-by-step with Mr. Bourke, would not likely have lagged far behind. Among the intangible qualities conducive to professional success with which the decedent may fairly be credited is a knack for knowing people in the right places. Mr. Bourke was a personal friend and close working companion of the decedent when both were in the relative wilderness of New Haven. Mr. Bourke's ascent in Washington may not have been matched by the decedent's, but his rising star could not but helped to have lighted the path of her own career.

*Probable Increases in Earning Capacity Throughout Decedent's Career*

Mrs. Rodmann of NLC/USCM testified in her deposition that in her organization, whose salary program tracks the federal government's General Schedule pay scales, employees customarily receive an annual in-grade increment in pay based on satisfactory performance during the year. This increment, of between three and three and one-quarter per cent, coincides with the in-grade steps on the GS scales, which provide for ten salary levels or "steps" within

each salary grade, such as GS–10 or GS–12. Because the higher steps of one grade may carry a salary greater than the lower steps of the next higher grade, when an employee is promoted by NLC/USCM to a higher grade, she enters that grade at a sufficiently advanced step for her to receive the usual incremental salary increase. This policy of incremental salary increases based on continued satisfactory performance is independent of any cost-of-living adjustments to the salary schedule as a whole.

The Court finds it reasonable to conclude that the decedent's earning capacity would have increased according to the general pattern at NLC/USCM, *i. e.*, with yearly increments as provided in the federal government's GS pay scales.[20] This conclusion, although itself a less-than-certain assumption, serves to eliminate a great deal of speculation because of the precise evidence before the Court as to salaries and promotions at NLC/USCM. Moreover, since the salary schedules of NLC/USCM are the same as the federal government's and are thus reflective of salaries throughout the metropolitan Washington area, the accuracy of future earning capacity valuations based on NLC/USCM salaries is not wholly dependent on the assumption that the decedent would have remained with NLC/USCM all her working life. The Court accordingly finds that from a salary of $15,040 as a first-step GS–12 for the fiscal year beginning July 1, 1971,[21] the decedent would have moved

20. The defendant's expert on the economics of computing future earnings did not disagree with the plaintiff that annual salary increases could reasonably be expected to have been awarded to the decedent as a matter of course. However, the defendant would have limited such increases to a flat $500 per year. *See* page 1289, *infra*. While reference was made in his written report to nationwide statistics on annual income growth, no evidence relating specifically to the facts of this case was adduced to support the expert's opinion as to this $500 figure, and the expert was not shown to have any special experience with or knowledge of white-collar salaries in the District of Columbia. Indeed, this $500 figure was contrary to the evi-

dence adduced by both sides as to likely salary increases which the decedent would have received had she remained employed in Connecticut. The decedent herself had received salary increases totalling $3,500 in less than two years. And Mrs. Donald testified for the defendant that a woman with only a B. A. degree, who had been hired in 1967 as a research assistant—a position carrying a $6,500 salary in 1969—now is a planner with her firm at a salary of $15,000 per year.

21. The use of the July 1 date not only serves the convenience of the Court but also reflects the fact that some time would necessarily have been taken for job hunting and possibly a vacation between the time the de-

up the GS scale first through the ten steps of the GS–12 grade, and then through the higher steps of successively higher grades.[22]

The plaintiff testified that his wife, the decedent, anticipated working about five years in Washington before ceasing work temporarily to have a family. The five-year period represented the decedent's estimate as to the time required to establish herself in her career, and also reflected the decedent's desire not to postpone her having children much beyond her 30th birthday. She and her husband planned to have "perhaps two children,"[23] and she was intent on devoting most of her time to her children until they were old enough to attend school, which her husband felt would have been six or eight years after she stopped working. The decedent did, however, hope to remain in contact with her profession as a legislative analyst and lobbyist, perhaps through part-time work during her child-rearing years, so as to enable her to resume her career when her children were in school.

The Court finds that the decedent would have spent eight years in which her principal occupation was child-rearing. This figure not only reflects the conservative side of her husband's estimate, but also falls squarely in the middle of the range of a professional woman's likely hiatus from her principal occupation in order to raise a family, insofar as that range was established at trial by the evidence of Mrs. Feidelson's 14 years away from work while raising her three children, and of the approximately two years' absence from full-time employment experienced by Mrs. Donald in raising her family.

During these eight years, however, the Court finds that the decedent would have remained in sufficient contact with her field of endeavor, by part-time employment or otherwise, to maintain her earning capacity at the level it would have reached by the time she would have left her job to embark on child-rearing. Thus while her earning capacity would not have increased during these eight years, it would also not have decreased.

Both parties adduced testimony from experts on the calculation of future earnings, and each such expert assumed that there were 40 years left in the decedent's working life at the time of her death. The Court adopts the parties' assumption of a 40-year working life for the decedent.[24] Thus the Court deems it reasonable to assume that (1) the decedent would have retired at the age of 65; and that (2) following such retirement, her employability and earning ca-

cedent would have finished her work with Cogen, Holt and the time she would have started work with a new employer in Washington.

22. The Court assumes that in moving from one grade to another, the decedent would have moved to that step in the higher grade paying a salary higher than her salary at the highest step in the next lower grade, even though the percentage increase in pay received by such a promotion to a higher grade was not as large as the approximately three per cent increment normally received upon moving up a step within any grade.

23. R.T. at 45.

24. The parties entered into the following stipulation:
"1. Nancy Hollander Feldman was 25 years of age at the time of her death;
2. Nancy Hollander Feldman was in good health immediately preceding the accident which caused her death;

3. A white woman aged 25 years has a life expectancy of 52 additional years."
No evidence was introduced tending to show that the decedent's earning capacity would probably or even possibly have been impaired by some future disability. Indeed, the autopsy of her body found no abnormalities or manifestations of disease. See page 1300, infra. In view of the decedent's stipulated good health at the time of her death the lack of any evidence showing she was prone to the loss of that good health, cf. Butler v. Steck, 146 Conn. 114, 122, 148 A. 2d 246 (1959) (dissenting opinion), and the essentially cerebral and sedentary nature of her occupation, the Court finds that even "with due allowance for the effect which the ordinary vicissitudes of life might have had upon [her] continued enjoyment of [her] capacities," Chase v. Fitzgerald, supra, 132 Conn. at 470, 45 A.2d at 793, the decedent would have had a 40-year working life.

pacity would be virtually nil. Unlike her consciously temporary withdrawal from employment in order to raise a family, the decedent's retirement could not reasonably be expected to have been accompanied by the retention of some residual earning capacity nourished by the intent to return to full-time employment at a later date. No evidence was presented that the decedent would have continued in her chosen vocation past the age of 65, which both parties' experts took to be the normal age of retirement. Nor was the decedent shown to have any potentially remunerative avocational talents. Compare Waldron v. Raccio, Conn.L.J., July 9, 1974, at 6, 9 (Conn.1974); Ray v. United States, 277 F.Supp. 952, 953–955 (D.S.C.1968); Cuneo v. Philadelphia Transportation Co., 405 Pa. 532, 176 A.2d 896, 898–899 (1962).

### Lifetime Valuation of Decedent's Earning Capacity

It is now possible, on the basis of the assumptions and findings heretofore made and justified, to assign a dollar value to the decedent's earning capacity in each of the 40 working years she had remaining to her at the time of her death. This can be accomplished by determining from the 1971 GS pay scales of the federal government the salary payable at each of the GS grades and steps within grades in terms of which the Court has defined the decedent's earning capacity for those 40 years. However, it must be realized that the values thus attributed to the decedent's year-by-year earning capacity represent "1971 dollars," i. e., dollar amounts not inflated to account for the reasonably expected decrease in the real purchasing power of the dollar amounts the decedent was capable of earning in each year remaining in her working life. According to this valuation process, the value of the decedent's earning capacity for "fiscal 1972," the fiscal year beginning July 1, 1971, is the 1971 salary for the first step in GS–12, $15,040. This increases over the next four years, so that

for fiscal 1976 the decedent's earning capacity is $17,044, the 1971 salary for the fifth step in GS–12. The decedent's earning capacity then remains unchanged over the next nine years—eight years of child rearing and the decedent's first year of employment thereafter. In 1986 the decedent's earning capacity goes up to the sixth step in GS–12, $17,545, and continues to rise thereafter one step at a time, with each change of grade being from the tenth step in one grade to the fifth step in the next higher grade. In the fortieth year, fiscal 2111, the decedent is at the seventh step of GS–16, with a 1971 salary of $33,757. See generally Table I, infra, p. 1298.

### Deduction of Probable Income Taxes

██ However, Connecticut law does not permit the loss to the decedent's estate caused by the destruction of the decedent's earning capacity to be measured through simple addition of the year-by-year earnings which that earning capacity was capable of producing. "[I]n measuring a person's actual loss from a permanent and total destruction of earning capacity, whether by death or injury, there is an important factor which must be offset against probable net earnings. That factor is any saving in income tax liability which can properly be attributed to a cessation of earned income." Floyd v. Fruit Industries, Inc., supra, 144 Conn. at 671, 136 A.2d at 925.

██ The parties differed in their calculations of probable tax rates. The defendant's expert credited the decedent with one-half the couple's standard deduction and her personal deduction and calculated the tax upon the remaining taxable income by reference to current tax rates on joint returns. This method yielded a rate of tax of approximately 16.7 per cent of gross income when gross income was $16,000. The plaintiff's expert used Internal Revenue Service figures for the average taxes paid at various income levels and derived a tax rate of approximately 23.4 per cent for a gross income of approxi-

mately $16,000, rising to 30 per cent for a gross income of approximately $27,000. The Court believes substantial justice may be achieved in this uncertain area by applying a flat tax rate of 25 per cent for each of the 40 years in question.

## IV

### Ascertainment of Present Value

■ The Court now has the basis for computing, year by year, the net loss to the decedent due to the destruction of her earning capacity as measured by the value of that earning capacity less the requisite deduction of her probable income taxes. However, Connecticut law requires that the Court allow, "as far as destruction of earning capacity is concerned, for the fact that a present payment will be made in lieu of sums which,

had [the decedent] lived, would have been received at periodic times in the future." Chase v. Fitzgerald, *supra,* 132 Conn. at 470, 45 A.2d at 793. An appropriate discount rate must thus be determined for the purpose of reducing to its value in 1974, see pages 1295–1297, *infra,* the amount of money which the decedent's earning capacity has been determined to be worth in each of the remaining years of her working life. This discount rate must reflect the probable rate of return on a prudent investment, so that the discounted total amount of loss suffered through destruction of earning capacity will, if prudently invested, earn enough interest for the total amount of damages and accumulated interest to cover exactly the periodic payments the decedent would have received had she had the opportunity to harness through employment her capacity to earn money.[25]

25. Connecticut law requiring the discounting to present value of a lump sum award of damages for the destruction of future earning capacity has not been explicated in any detail, and appears to be based on common sense and the common law. Chase v. Fitzgerald, *supra,* 132 Conn. at 469, 45 A.2d 789, relies solely on Jackiewicz v. United Illuminating Co., 106 Conn. 310, 314, 138 A. 151 (1927), as authority for the present value rule set forth in *Chase.* *Jackiewicz* in turn cites only an obscure Pennsylvania case, Kost v. Ashland Borough, 236 Pa. 164, 84 A. 691, 692 (1912), which makes merely a passing reference to present worth as a factor to be considered by a jury, and concentrates, as does *Jackiewicz* itself, on the factors to be considered by a jury in first setting the lump sum whose present worth must be computed.

In the light of this lack of elaboration of the Connecticut rule on discounting lump sum awards to present value, it may fairly be assumed that Connecticut courts seek only to apply the traditional common law rule, as masterfully restated by the Supreme Court in an early case under the Federal Employers' Liability Act, Chesapeake & Ohio R. Co. v. Kelly, 241 U.S. 485, 489–491, 36 S.Ct. 630, 631, 60 L.Ed. 1117 (1916) :

"So far as a verdict is based upon the deprivation of future benefits, it will afford more than compensation if it be made up by aggregating the benefits without taking account of the earning power of the money that is presently to be awarded. It is

self-evident that a given sum of money in hand is worth more than the like sum of money payable in the future. Ordinarily a person seeking to recover damages for the wrongful act of another must do that which a reasonable man would do under the circumstances to limit the amount of the damages. [Citations omitted.] And the putting out of money at interest is at this day so common a matter that ordinarily it can not be excluded from consideration in determining the present equivalent of future payments, since a reasonable man, even from selfish motives, would probably gain some money by way of interest upon the money recovered. Savings banks and other established financial institutions are in many cases accessible for the deposit of moderate sums at interest, without substantial danger of loss; the sale of annuities is not unknown; and, for larger sums, state and municipal bonds and other securities of almost equal standing are commonly available.

"Local conditions are not to be disregarded, and besides, there may be cases where the anticipated pecuniary advantage of which the beneficiary has been deprived covers an expectancy so short and is in the aggregate so small that a reasonable man could not be expected to make an investment or purchase an annuity with the proceeds of the judgment. But, as a rule, and in all cases where it is reasonable to suppose that interest may safely be earned upon the amount that is awarded,

The problem in determining a fair discount rate is the difficulty of anticipating what effect inflation will have on interest rates in the future. Traditionally discount rates have been determined by reference to the return provided by "risk-free" investments, such as obligations of the federal government. It was thought that, since there was virtually no risk of loss, the rate of return received by investors on this sort of obligation represented payment purely for the use of capital. It is abundantly clear, however, that one risk the federal government cannot extend a guarantee against, to its creditors or to its citizens, is inflation. Accordingly, contemporary investors have demanded a substantial premium in addition to payment for the use of their capital as compensation for the substantial risk that when they get back the money they have lent, that money will be worth significantly less in terms of real purchasing power than it was when it was lent. Expectations of inflation have accordingly driven up present interest rates to historic heights, even on "risk-free" obligations. Thus the evidence adduced at trial showed that the yield on one of the money market's standard measures of a "risk-free" rate of return, a three-month treasury bill, was 2.93 per cent in 1960 and 8.57 per cent in April of 1974.

The defendant's expert insisted on the use of a six or seven per cent discount figure, somewhat below the current short-term "risk-free" rate of return because of the 40-year overall period to which the discount rate is to be applied, but nevertheless reflective of inflationary expectations in the money market. The defendant's expert did not, however, similarly incorporate inflationary expectations into his assumptions of the decedent's probable future earnings, crediting her only with $500 annual salary increments in the early years of her career, without any cost-of-living adjustments. See note 20, *supra*. Thus the defendant's calculations achieved the self-serving result of minimizing the value of the decedent's probable future earning capacity by ignoring inflation, and then maximizing the amount by which that future earning capacity is to be discounted to present value by assuming the continuance of inflationary interest rates.

The plaintiff's approach was to avoid speculation as to inflation by evaluating the loss of the decedent's earning capacity in terms of "1971" dollars, with no account taken of the declining value of those dollars over time due to inflation. Plaintiff's expert then sought similarly to factor inflation out of "risk-free" yields so as to derive an "inflation-free"

the ascertained future benefits ought to be discounted in the making up of the award.

"We do not mean to say that the discount should be at what is commonly called the "legal rate" of interest; that is, the rate limited by law, beyond which interest is prohibited. It may be that such rates are not obtainable upon *investments* on safe securities, at least, without the exercise of financial experience and skill in the administration of the fund; and it is evident that the compensation should be awarded upon a basis that does not call upon the beneficiaries to exercise such skill, for where this is necessarily employed, the interest return is in part earned by the investor rat'.er than by the investment. This, however, is a matter that ordinarily may be adjusted by scaling the rate of interest to be adopted in computing the present value of the future benefits; it being a matter of common knowledge that, as a rule, the best and safest investments, and those which require the least care, yield only a moderate return.

"We are not in this case called upon to lay down a precise rule or formula, and it *is not our purpose to do this*, but merely to indicate some of the considerations that support the view we have expressed that, in computing t'e damages recoverable for the deprivation of future benefits, the principle of limiting the recovery to compensation requires that adequate allowance be made, according to circumstances, for the earning power of money; in short, that when future payments or other pecuniary benefits are to be anticipated, the verdict should be made upon the basis of their present value only."

as well as a "risk-free" discount rate to apply to the monetary value of the decedent's year-by-year loss of earning capacity.

### Consideration of Inflation by Other Courts

There is nothing novel about the trier of fact in a personal injury or wrongful death action taking account of inflation in computing truly compensatory damages. Over half a century ago, the Vermont Supreme Court was able to cite extensive authority for considering inflation in awarding damages.

"The result sought by the law in assessing damages in [tort] cases is compensation—so far as a money payment can—the ascertainment of such a sum as will compensate the plaintiff for the injury. Necessarily, damages are to be expressed in terms of money. And while money is the standard of value by which the worth of all other property is to be measured, and while, in theory, its value remains constant and unfluctuating, and while it must be admitted that really it is prices which rise and fall amid changing economic conditions, yet, after all, in a very real and practical sense money itself is a shifting standard, varying in value according to the changes in its purchasing power. As a medium of exchange, its value appreciates or depreciates according to the rise and fall in commodity prices. So it is that, at least so far as those elements of damages properly classed as pecuniary losses—like loss of time, loss of earning power, expenses and the like—are concerned, it is proper for the jury to take into consideration the fact, known to everybody, that the purchasing power of money is at present seriously impaired." Halloran v. New England Telephone & Telegraph Co., 95 Vt. 273, 115 A. 143, 144, 18 A.L.R. 554 (1921).

See also Bowes v. Public Service R. Co., 94 N.J.L. 378, 110 A. 699, 700 (1920); O'Meara v. Haiden, 204 Cal. 354, 268 P. 334, 60 A.L.R. 1381, 1390 (1928).

Not surprisingly, expressions of judicial cognizance of the declining purchasing power of the dollar have tended to coincide with periods of pronounced inflation. The inflation experienced in the aftermath of World War Two was even more rampant than that which followed World War One, and produced a flood of opinions taking heed of inflation. "Consideration may properly be given the lessened purchasing and earning power of money," declared the Iowa Supreme Court in Jackson v. Chicago, M., St. P. & P. R. Co., 238 Iowa 1253, 30 N.W.2d 97, 105 (1947). See also Pauly v. McCarthy, 109 Utah 431, 184 P.2d 123, 127 (1947); Kircher v. Atchison, T. & S. F. R. Co., 32 Cal.2d 176, 195 P. 2d 427, 434 (1948); Western & Atl. R. Co. v. Burnett, 79 Ga.App. 530, 54 S.E. 2d 357, 367 (1949); Nusser v. United Parcel Service of New York, 3 N.J.Super. 64, 65 A.2d 549, 552 (App.Div. 1949); Bethke v. Duwe, 256 Wis. 378, 41 N.W.2d 277, 280 (1950); Reinmueller v. Chicago Motor Coach Co., 341 Ill. App. 178, 93 N.E.2d 120, 125 (1950); France v. Newman, 35 Tenn.App. 486, 248 S.W.2d 392, 396 (1951); Johnson v. Schrepf, 154 Neb. 317, 47 N.W.2d 853, 858 (1951); Ft. Worth & D. C. R. Co. v. Gifford, 252 S.W.2d 204, 206 (Tex.Civ. App.1952); Wiest v. Twin City Motor Bus Co., 236 Minn. 225, 52 N.W.2d 442, 445 (1952); Rogers v. Atlantic Coast Line R. Co., 222 S.C. 66, 71 S.E.2d 585, 590 (1952). See generally, Annotation, 12 A.L.R.2d 611 (1950). Courts have continued to go on record up to the present day as approving consideration of inflation in the computation of damages. See Normand v. Thomas Theatre Corp., 349 Mich. 50, 84 N.W.2d 451, 457 (1957); Willard v. Hutson, 234 Or. 148, 378 P.2d 966, 975–976, 1 A.L.R.3d 1092 (1963); Barnett v. Trinity Universal Ins. Co., 286 So.2d 770 (La.App.1973).

Although in sanctioning generalized consideration of past and present inflation by the trier of fact the above cited cases have implicitly permitted expectations of future inflation to influence an award of damages, some courts have re-

mained reluctant to allow future inflation's effect on wages and prices to be explicitly taken into account in calculating damages. See Beanland v. Chicago, R. I. & Pac. R. Co., 480 F.2d 109, 117, n. 1 (8th Cir. 1973) (concurring opinion); 2 Harper & James, The Law of Torts § 25.11, at 1325–1326 (1956). This reluctance seems to be grounded in a sound judicial aversion to speculation. See, e. g., Sleeman v. Chesapeake & Ohio R. Co., 414 F.2d 305, 308 (6th Cir. 1969); Frankel v. United States, 321 F.Supp. 1331, 1346 (E.D.Pa.1970), aff'd 466 F. 2d 1226, 1229 (3d Cir. 1972). "Yet," in the words of Judge Friendly, "there are few who do not regard some degree of continuing inflation as here to stay and would be willing to translate their own earning power into a fixed annuity, and it is scarcely to be expected that the average personal injury plaintiff will have the acumen to find investments that are proof against both inflation and depression—a task formidable for the most expert investor." McWeeney v. New York, N. H. & H. R. Co., 282 F.2d 34, 38 (2d Cir. 1960) (footnote omitted).

It is not yet clear to what extent Connecticut courts in particular are prepared to recognize inflation as a factor in computing damages for the destruction of future earning capacity. The leading case dealing with instructions to a jury to consider inflation held such instructions improper on the facts of the particular case there in issue, but expressly reserved judgment whether a "case could arise in which it would be proper to charge the jury that they should take into consideration the depreciated value of the dollar in assessing damages." Quednau v. Langrish, 144 Conn. 706, 714, 137 A.2d 544, 549 (1957). That case also noted that Connecticut law has often looked to the depreciating purchasing power of the dollar in comparing present awards of damages challenged as excessive with past awards for similar injuries. *Id.* The only other Connecticut case on the subject followed *Quednau* in holding that a requested instruction on inflation was

properly refused, but like *Quednau* this holding was tied specifically to the particular facts of the case, which involved a 66-year-old plaintiff's loss of pre-trial but not future earning capacity. Cooley v. Crispino, 21 Conn.Supp. 150, 151, 147 A.2d 497 (Super.Ct.1958).

Of course, so long as juries are not instructed specifically to exclude expectations of inflation from their calculations, they are likely to consider the impact of inflation on future earning capacity in rendering a verdict. Cf. Willard v. Hutson, *supra,* 378 P.2d at 976. It should also be noted that Connecticut is among the minority of states requiring damages for loss of earning capacity to be reduced by probable income taxes on the earnings which could have been derived from the lost earning capacity. Floyd v. Fruit Industries, Inc., *supra,* 144 Conn. at 671–673, 136 A.2d 918. *Cf.* Brooks v. United States, 273 F.Supp. 619, 628–632 & n. 17 (D.S.C.1967); Annotation, 63 A.L.R.2d 1393 (1959). Thus Connecticut, unlike most jurisdictions, does not inflate judgments for personal injuries or wrongful death by ignoring the taxes payable on future earnings, and so denies to plaintiffs the very windfall which was cited by Judge Friendly as being offset, at least in part, by the failure of the law to allow explicitly for the effect of inflation on a lump sum money judgment. See McWeeney v. New York, N. H. &. H. R. Co., *supra,* 282 F.2d at 37–38.

*Consideration of Inflation in This Case*

In Perry v. Allegheny Airlines, Inc., 489 F.2d 1349 (2d Cir. 1974), the Court of Appeals affirmed a $369,400 jury verdict for another victim of the air crash involved in the instant case. Among the claims of error rejected in the *Perry* appeal was this Court's admission into evidence of the opinion of an expert as to the decedent's loss of future earning capacity, which opinion reflected "certain assumptions concerning future rates of inflation and interest." *Id.* at 1351. But the Court of Appeals noted that this Court had charged the jury that they

were not bound by the expert's opinion. *Id.* at 1353.

■ In the instant case, the Court must reach a decision itself on the weight to be accorded the opinion evidence of the parties' respective experts. As adumbrated earlier, the Court agrees with the basic assumption of the plaintiff's expert that the value of the decedent's future earning capacity should be calculated in terms of "1971 dollars" by reference to the wages payable in 1971 at each step on the salary scale which the evidence established was likely to be traversed by the decedent during her working life. But see note 34, *infra.* The Court's adoption of this basis for evaluating lost earning capacity is not, however, based on any reluctance to consider inflation as a factor affecting the value of future earning capacity. Rather, the fortuitous availability of a reliable guide to the value of the decedent's lost future earning capacity offers a means to avoid undue speculation on the extent to which inflation as opposed to individual merit would contribute to the decedent's probable year-to-year increase in earning capacity. Thus, in this case the Court as finder of fact has chosen not to consider inflation in estimating in dollar amounts the damages suffered by the decedent's estate due to the destruction of her future earning capacity.

This presents the Court with the converse of the question whether the finder of fact should consider inflation in evaluating the loss of future earning capacity: whether inflation should be considered in setting the interest rate by which the already assessed dollar amounts of damages for the loss of future earning capacity are to be discounted to their present value. Where inflation has indeed been considered in arriving at a dollar amount as compensation for lost future earning capacity, it follows that the same expectations of inflation must be applied to calculations of the probable future interest rates at which the award may be invested. See Wilkinson v. Yamashita-Shinnihon Kisen, K.K., 366 F.Supp. 110, 117 (D.Md. 1973) [five per cent discount rate applied]. It is also clear that, even where inflation has *not* been taken into account in computing the dollar amounts of damages for lost future earning capacity, the present value of future earnings cannot be established without applying any discount at all upon the assumption that the yield to be expected upon prudent investment of the lump sum award will be *entirely* offset by future inflation. See Sleeman v. Chesapeake & Ohio R. Co., 424 F.2d 547 (6th Cir. 1970), reversing 305 F.Supp. 33 (W.D. Mich.1969).[26] If inflation is foreseeable enough to be considered by a court in setting the rate at which a lump sum is to be discounted to present worth, it is sure to be reflected in the interest rates at which that lump sum may be invested,[27] and thus the yield on a "risk-free" (except for inflation) investment in an economy in which inflation is expected will exceed the expected rate

---

26. *But cf.* Beaulieu v. Elliott, 434 P.2d 665, 671 (Alaska 1967), holding that in the interests of justice awards of damages for the loss of future earning capacity should not be discounted to present value, and referring to the offsetting effect of inflation as justifying this rule. This case may reflect exceptional conditions of inflation in a "frontier" state, which local conditions would not necessarily be reflected in the nationally oriented rates of return offered by "risk-free" investments such as debt instruments of the federal government and federally insured savings bank accounts. To the extent that it refuses to require discounting to present value on the basis of more generalized notions of justice and fairness, *Beaulieu* may also reflect an-

other factor offsetting a plaintiff's recovery of "compensatory" damages: attorney's fees. *Cf.* McWeeney v. New York, N. H. & H. R. Co., *supra*, 282 F.2d at 38.

27. "If an inflation goes on for a long time and is no longer 'unforeseen,' an allowance for a price rise may get itself built into the market interest rate. Thus, if we all expect prices to rise at 3 per cent per year, my pension funds invested in bonds and mortgages may pay me 7 per cent rather than 4 per cent. This adjustment of interest rates to strong inflation has been observed in Brazil, Chile, and even the United States after World War II." P. Samuelson, Economics 259, n. 2 (7th ed. 1967).

of inflation by an amount approximating the prevailing price of capital—"the earning power of money." Chesapeake & Ohio R. Co. v. Kelly, 241 U.S. 485, 491, 36 S.Ct. 630, 60 L.Ed. 1117 (1916).[28] When, as in the instant case, inflationary factors have been expressly excluded from calculation of the sums to be discounted, the appropriate rate of discount is this price of capital, obtained by adjusting interest rates on "risk-free" investments so as to exclude the additional interest demanded by the investment market as compensation for investors' assumption of the risk of inflation.

### Ascertainment of Inflation-Adjusted Discount Rate

The plaintiff's expert derived an inflation-adjusted discount rate of 1.5 per cent by comparing the average yearly increase in the Department of Labor's Consumer Price Index (CPI) over the past 18 years, 2.87 per cent per year, with the average rates of return on several types of essentially "risk-free" investments over the same period of time: 3.75 per cent for time deposits in members of the Federal Reserve Bank system; 4.14 per cent for deposits in all mutual savings banks; 4.24 per cent for deposits in some specific mutual savings banks; and 4.64 per cent earned from their investments by insurance companies, this latter figure being reflective of the rate of return which a sophisticated investor willing to take some risks might earn. The differential between these figures and the 2.87 per cent average rate of inflation since 1956 resulted in a figure of from .88 per cent to 1.77 per cent, representing that part of the annual yield which constitutes payment for the use of capital (hereinafter referred to as "real yield"). The expert took the 4.14 per cent average earnings from mutual savings bank investments as representative of the investment which could be expected of a prudent, non-sophisticated investor, and rounded up to 1.5 per cent the 1.27 per cent difference between this 4.14 per cent rate of return and the 2.87 per cent rate of inflation.

The Court considers the plaintiff's concept of the need to derive an inflation-adjusted discount rate to be basically reasonable, but in view of the plaintiff's relatively sparse evidence in support of a 1.5 per cent discount rate, the Court has sought corroboration for this particular figure. The Court's attention having been directed by the defendant's expert's report[29] to a handy source of relevant economic data, the *1974 Economic Report of the President*, the Court undertook to calculate on the basis of judicially noticed data therein the real yields, with inflation factored out, of investments made since 1940 at the rates of interest paid on various types of securities issued by the federal government. These calculations, which are explicated and reproduced in tabular form as an Appendix to this opinion, provide sufficient corroboration—even with due regard for the Court's lack of expertise in this area and the perils of economic forecasting based on past data[30]—for the Court to credit the plaintiff's evidence that a 1.5 per cent real yield is a fair figure to apply for discounting purposes over a 40-year period.

While real yields on the order of 2 per cent per year may be attained during a period of a low, stable rate of inflation, such as the period examined in Table A–II of the Appendix, upward shifts in the rate of inflation can erode drastical-

28. *See* note 25, *supra.*

29. "Value of Life Calculation," Defendant's Exhibit F, at 2, nn. 2 & 3.

30. *See* note 33, *infra.* Of course, since Connecticut law requires the discounting to present value of damages for the destruction of future earning capacity, and since such discounting demands assessment of the future earning power of money, the Court is compelled to engage in economic forecasting despite the inexactitude of the dismal science's soothsaying. It is not open to this Court to decide that the ascertainment of a discount rate has become too speculative to be fair, and that the statutory mandate of awarding "just damages" for wrongful death, Conn.Gen.Stats. § 52–555, would be better served by dispensing with the discounting process altogether. *Cf.* note 26, *supra.*

ly the average real yield of a long-term investment, and an accelerating rate of inflation has often outdistanced the real yields even on short-term securities, such as Treasury bills, which should be especially sensitive to fluctuations in the rate of inflation.[31] Use of a 1.5 per cent rather than a 2.0 per cent discount rate allows a margin of error to compensate for unexpected increases in the rate of inflation which may depress long-term real yields.[32] Moreover, the government securities upon which the investment models of the Appendix are based are the domain of sophisticated investors, since these securities are sold only in large denominations and, in the case of Treasury bills, are payable to bearer and mature rapidly, thus requiring that the investor pay constant attention to funds so committed. Since the government assumes only minimal administrative duties in connection with such sophisticated instruments of debt, these securities generally afford a higher rate of return than other forms of federally guaranteed investments designed for use by the general public. *Cf.* Wolak v. United States, 366 F.Supp. 1106, 1114 (D.Conn.1973). Thus as an index of the real rate of return which a prudent but non-professional investor can be expected to earn on a lump sum of money over a 40-year period, the Appendix is, if anything, overly generous to the defendant.

The Court concludes, on the basis of the evidence adduced at trial, the evidence judicially noticed and collated in the Appendix, and judicial notice of the continuing erratically inflationary behavior of the American economy,[33] that

31. It should be noted that despite the apparent predictability of inflation since the late 1960's, even current interest rates are being outpaced by inflation. Table A–I of the Appendix shows that average yields on three-month Treasury bills in 1973 lagged 1.6 per cent behind inflation. Thus the 8.57 per cent yield on Treasury bills in mid-April 1974, adverted to by the defendant as supportive of a high discount rate to be applied in this case, must be measured against subsequently obtained statistics on inflation, *see* note 1 of the Appendix, *infra.* The Consumer Price Index in April 1974 was 10.3 per cent higher than in April 1973. In the three months from January to April 1974, the Index rose by 3.2 per cent, which translates to a 12.8 per cent annual rate of inflation, nearly half again higher than the then-current 8.57 per cent per year yield on Treasury bills.

32. The Appendix demonstrates that, at least over the past 34 years, unexpected *decreases* in the rate of inflation have not occurred in the magnitude or with the frequency necessary to offset by themselves, through temporary enhancement of the real yield on investments, the converse effect of unexpected *increases* in the rate of inflation. *See especially* Table A–IV.

Furthermore, the Appendix did not take into account the effect of personal taxation on the net real yield of investments.

33. *See, e. g.,* "Theory deserts the forecasters," *Business Week,* June 29, 1974, at 50, 52–54:

"The basic technique of forecasting is to observe the past and look for clues to what will happen in the future. But there is nothing in the past comparable to the inflation-wracked, shortage-ridden U. S. economy of today. The forecaster must work without analogies, which is to say, he must work in the dark.

" * * *

"[G]reat changes have overwhelmed economic theory in recent years: Inflation has become a dominating influence, instead of just an irritating aberration, in practically all the industrialized economies.

" . . .

" * * *

" . . . Since the Great Depression, the government of every major nation has formally acknowledged responsibility for maintaining maximum levels of employment, production, and incomes. In combination with the trend toward regulation and intervention, this has created what is usually called a 'mixed economy,' a system in which performance at any time is determined not only by the market and the interaction of producers and consumers but also by government policy.

" . . . Even when the economic policy-makers are willing to clamp down—which they often are not—the mixed economy has a strong inflationary bias.

"Says Nobel laureate Paul A. Samuelson: 'It is a terrible blemish on the mixed economy and a sad reflection on my generation of economists that we're not the Merlins that can solve the problem. Inflation is deep in the nature of the welfare state. . . . '

" * * *

"Whatever the causes, the inflationary bias of today's economy is a problem for theorists and forecaster's alike. Economic

1.5 per cent per year is an appropriate figure by which to discount an award of damages based on the destruction of future earning capacity when that award has itself been computed without consideration of inflation affecting that amount subsequent to the date of the injury upon which the award is premised. To expect a prudently invested award to return a real yield of more than 1.5 per cent per year, and accordingly to discount in advance by more than 1.5 per cent per year, an amount found to be fair compensation—in the absence of inflation—for damages suffered, would be to deny to the decedent's estate in a wrongful death action the "just damages" to which (in Connecticut) it is statutorily entitled. Conn.Gen.Stats. § 52–555.

### Length of Time Discount Rate to be Applied

Having ascertained the discount rate to be applied in reducing to present worth the year-by-year values placed upon the decedent's lost future earning capacity, it remains to determine the length of time over which these year-by-year values are to be discounted. Two questions are involved. First, whether present value is to be determined as of 1971, the date of death, or 1974, the date of judgment. Second, from what point within each fiscal year of lost future earning capacity the discounting process is to begin.

The first question is intimately related to the subject of prejudgment interest. In the instant case, complete consistency with the use of "1971 dollars" rather than "1974 dollars," see note 34, *infra,* in the lost future earning capacity valuations would require the calculation of the total loss to the decedent for the destruction of future earning capacity in terms of "1971 dollars" discounted to their value at the time of her death, and this total loss would then be subject to prejudgment interest at some rate, such as Connecticut's six per cent per annum legal interest, Conn.Gen.Stats. §§ 37–1, 37–3a, which would provide compensation both for the loss of use of this money between the date of death and of judgment, and for the decline in value of the dollar during the same period, since of course payment will be tendered not in "1971 dollars" but in "1974 dollars" of considerably less real purchasing power.

Complete consistency is thwarted, however, by the Connecticut rule that prejudgment interest may not be awarded on unliquidated claims for compensatory damages unless "the damage is of the sort which could reasonably be ascertained by due inquiry and investigation on the date from which interest is awarded." United Aircraft Corporation v. International Ass'n of Machinists, 161 Conn. 79, 107, 285 A.2d 330, 345 (1971). Nothing is more conclusively established by the instant memorandum of decision than the difficulty of ascertaining the amount of damages due in this case; accordingly an award of prejudgment interest as such would not be proper under Connecticut law.

The Court of Appeals has addressed itself to just the situation presented herein. In LeRoy v. Sabena Belgian World Airlines, 344 F.2d 266, 277 (2d Cir. 1965), the district court had discounted damages based on lost future earning capacity to their value as of the date of death. Then, applying New York law which in turn required application of Italian law, the trial court had found that Italian law would not allow an award of prejudgment interest for the period between the date of death and the date of judgment. The Court of Appeals affirmed the finding that prejudgment interest could not be awarded, but required that damages be discounted

theory is at its best w en it is describing equilibrium positions, in which supply is equal to demand and prices are clearing the market. But, argues [Yale Professor James] Tobin, the behavior of the economy in the past few years has been characteristic of a system in disequilibrium:

Markets are not cleared, supply does not equal demand. 'Lots of people are working on the dynamics of markets,' he observes, 'but it's going to be a long time before this gets synthesized into current theoretical structure.' "

only to the date of judgment. The Court of Appeals indicated that when the law of the forum forbids prejudgment interest, that prohibition is to be narrowly construed and unless discounting to the date of death is specifically required, de facto prejudgment interest is to be awarded by discounting damages based on future earnings only to the time of judgment.

■■■ This case clearly falls within the Court of Appeals' mandate. Connecticut's prohibition on the award of prejudgment interest is not so specific or pervasive as to suggest that discounting damages for the loss of future earning capacity merely to the time of judgment would conflict with Connecticut public policy. Indeed, such a method of discounting is suggested by Connecti-

cut's formulation of the need for discounting in terms of present payment rather than value at time of death: "the trier must consider . . . the fact that a present cash payment will be made . . . ." Chase v. Fitzgerald, *supra,* 132 Conn. at 469, 45 A.2d at 792. Because of the difference in this case between the discount rate and the appropriate prejudgment interest rate, the Court of Appeals' remedial discounting process will still leave the plaintiff considerably short of the total recovery which would be produced by adding prejudgment interest to damages discounted to 1971, but the plaintiff is nevertheless entitled to the benefit, however moderate, of having damages based on post-judgment future earning capacity reduced only to their value as of the time of judgment.[34] The loss of earning ca-

34. If the future earning capacity values listed in Table I were discounted to July 1, 1971, rather than July 1, 1974, they would total $478,879. If the personal living expense values listed in Table II were discounted to July 1, 1971, rather than to July 1, 1974, they would total $149,268. Adding in the $100,000 awarded for the intangible loss of the capacity to enjoy life's activities, the total award under the July 1, 1971, discounting process, exclusive of prejudgment interest, would be $429,611. This is $14,445 less than the judgment herein awarded pursuant to the July 1, 1974, discounting method. However, prejudgment interest at six per cent per annum, without compounding, even if figured only on the $329,611 future earnings portion of the $429,611 total damages under the 1971 discounting method, would add $59,330, increasing the total award under the 1971 discounting method, with prejudgment interest, to $488,941, $44,885 more than the judgment herein awarded.

It should be noted that an even higher total award than that resulting from the 1971 discounting method plus prejudgment interest would result from valuing the decedent's lost future earning capacity (for years from the date of judgment forward) in terms of "1974 dollars" rather than "1971 dollars." Under this method, the use of fixed salary levels without regard to future inflation and the use of an inflation-adjusted discount rate would continue, but the federal government's General Schedule of 1974 rather than 1971 would be used to value the decedent's year-

by-year future earning capacity for all fiscal years from 1975 forward. These values would then be discounted back to their present worth in 1974. Under this method of computation, prejudgment interest, even if allowed, would be applicable only to the three years of earning capacity lost to the decedent between the date of death and the date of judgment, since in all other respects the judgment would already reflect the decline in the real purchasing power of the dollar between 1971 and 1974, and the fact that the decedent's estate will not gain the use of the judgment until 1974. The current General Schedule, which went into effect on October 1, 1973, averages 16 and ⅓ per cent higher than the General Schedule in effect at the time of Mrs. Feldman's death. *See* 5 U.S.C.A. § 5332 (Supp.1974, at 48). Applying this 16 and ⅓ per cent differential to both future earning capacity values and personal living expenses for the fiscal years 1975 forward, as discounted to their present values in 1974, would add $51,862 to the judgment herein, for a total of $495,918. However, since the evidence presented at trial on salary levels and personal living expenses was oriented primarily toward the calculation of these items in terms of "1971 dollars," and since the computation of damages in terms of "1971 dollars" rather than "1974 dollars" leads to a just result even in the absence of prejudgment interest, the Court will adhere to the plaintiff's suggested methodology of computing damages in terms of "1971 dollars."

pacity between the time of death and the date of judgment has already accrued. That loss, as of now, can no longer be considered a loss of "future" earnings. Accordingly, damages for lost earning capacity during the years between Mrs. Feldman's death and judgment herein shall be computed at face value without discounting or the addition of prejudgment interest, and damages for lost earning capacity for years after the date of this judgment shall be discounted to their present value as of July 1, 1974.[35]

The second question concerning the length of time over which the discount rate is to be applied revolves around "[the] periodic times in the future," Chase v. Fitzgerald, *supra*, 132 Conn. at 470, 45 A.2d at 793, at which the decedent would have received the value of her future earning capacity had she lived. In order to discount the value attributed to each fiscal year of Mrs. Feldman's lost earning capacity simply for the number of years between the beginning of that fiscal year and July 1, 1974, it would have to be assumed that had she lived she would have received the value of her annual earning capacity in a lump sum every July 1, at the beginning (or end) of each fiscal year. Such an assumption of yearly intervals in the decedent's receipt of the value of her future earning capacity, while avoiding the difficulty of discounting the year-by-year values by fractional numbers of years, would not fairly reflect the "periodic times in the future" by which present value is to be computed. In fact, the decedent would far more likely have received the value of her earning capacity in equal installments throughout each fiscal year, in the form of monthly or semi-monthly paychecks. The amount of the lump sum required on July 1, 1974, to provide (when compounded at 1.5 per cent annually) an amount sufficient to pay out in equal installments throughout any given fiscal year the total value of the decedent's lost earning capacity for that year, can be approximated by discounting the value for that fiscal year's lost earning capacity from a point mid-way through that fiscal year, *i. e.*, January 1. The decedent's estate is thereby credited with retaining the use of the money awarded for each fiscal year's lost earning capacity during one half of the year for which it was awarded, to reflect the reciprocal fact that, since she would not have received a lump sum payment of salary at the beginning of each fiscal year, the decedent herself, had she lived, would have had only one-half year's use, on the average, of the total value of her earning capacity for each fiscal year.[36]

35. The year-by-year values of the decedent's lost future earning capacity have been computed on the basis of fiscal years beginning on July 1 of each calendar year. *See* note 21, *supra*. For the sake of convenience, the present values for each fiscal year's earning capacity will be computed as of July 1, 1974, rather than the exact date of the judgment herein.

36. The actual length of time during which one receiving payments of equal amounts at equal intervals has the use of, on the average, the entire amount received is one half of the time between the receipt of the first payment and receipt of the last payment. Thus if a year's salary is received in monthly installments, one receives the use of the entire year's salary for five and one-half months; if paid by the week, one would have the use of the year's salary for twenty-five and one-half weeks. The use of a point six months from the end of each fiscal year for discounting purposes in Table I and Table II, instead of a point five and one-half months from the end of each fiscal year, has a *de minimis* effect on the present value computations, while contributing greatly to the convenience of the Court. Indeed, computation of present value from the middle of each fiscal year instead of from the end of each fiscal year enhances the plaintiff's recovery in Table I by only $3,978, while increasing the deduction from plaintiff's recovery for personal living expenses, as set forth in Table II, by only $1,098, for a net difference of only $2,880.

The total amount of damages suffered by Mrs. Feldman because of the destruction of her future earning capacity, as discounted to present value, is set forth in Table I.[37]

TABLE I
Computation of Damages for Loss of Earning Capacity

| Fiscal year ending June 30, | Value of lost earning capacity | | Net after 25% tax | Discounted at 1.5% for (years) | Present value on July 1, 1974 |
|---|---|---|---|---|---|
| | GS Level | GS Salary | | | |
| 1972 | 12-1 | $15,040 | $11,280 | -0- | $11,280 |
| 1973 | 12-2 | 15,541 | 11,656 | -0- | 11,656 |
| 1974 | 12-3 | 16,042 | 12,032 | -0- | 12,032 |
| 1975 | 12-4 | 16,543 | 12,407 | 1/2 | 12,315 |
| 1976 | 12-5 | 17,044 | 12,783 | 1 1/2 | 12,500 |
| 1977 | 12-5 | 17,044 | 12,783 | 2 1/2 | 12,315 |
| 1978 | 12-5 | 17,044 | 12,783 | 3 1/2 | 12,134 |
| 1979 | 12-5 | 17,044 | 12,783 | 4 1/2 | 11,954 |
| 1980 | 12-5 | 17,044 | 12,783 | 5 1/2 | 11,778 |
| 1981 | 12-5 | 17,044 | 12,783 | 6 1/2 | 11,604 |
| 1982 | 12-5 | 17,044 | 12,783 | 7 1/2 | 11,432 |
| 1983 | 12-5 | 17,044 | 12,783 | 8 1/2 | 11,263 |
| 1984 | 12-5 | 17,044 | 12,783 | 9 1/2 | 11,097 |
| 1985 | 12-5 | 17,044 | 12,783 | 10 1/2 | 10,933 |
| 1986 | 12-6 | 17,545 | 13,159 | 11 1/2 | 11,088 |
| 1987 | 12-7 | 18,046 | 13,535 | 12 1/2 | 11,236 |
| 1988 | 12-8 | 18,547 | 13,910 | 13 1/2 | 11,377 |
| 1989 | 12-9 | 19,048 | 14,286 | 14 1/2 | 11,512 |
| 1990 | 12-10 | 19,549 | 14,662 | 15 1/2 | 11,640 |
| 1991 | 13-5 | 20,129 | 15,097 | 16 1/2 | 11,808 |
| 1992 | 13-6 | 20,721 | 15,541 | 17 1/2 | 11,975 |
| 1993 | 13-7 | 21,313 | 15,985 | 18 1/2 | 12,136 |
| 1994 | 13-8 | 21,905 | 16,429 | 19 1/2 | 12,289 |
| 1995 | 13-9 | 22,497 | 16,873 | 20 1/2 | 12,434 |
| 1996 | 13-10 | 23,089 | 17,317 | 21 1/2 | 12,573 |
| 1997 | 14-5 | 23,591 | 17,693 | 22 1/2 | 12,656 |
| 1998 | 14-6 | 24,285 | 18,214 | 23 1/2 | 12,836 |
| 1999 | 14-7 | 24,979 | 18,734 | 24 1/2 | 13,008 |
| 2000 | 14-8 | 25,673 | 19,255 | 25 1/2 | 13,172 |
| 2001 | 14-9 | 26,367 | 19,775 | 26 1/2 | 13,328 |
| 2002 | 14-10 | 27,061 | 20,296 | 27 1/2 | 13,477 |
| 2003 | 15-5 | 27,483 | 20,612 | 28 1/2 | 13,484 |
| 2004 | 15-6 | 28,291 | 21,218 | 29 1/2 | 13,676 |
| 2005 | 15-7 | 29,099 | 21,824 | 30 1/2 | 13,858 |
| 2006 | 15-8 | 29,907 | 22,430 | 31 1/2 | 14,033 |
| 2007 | 15-9 | 30,715 | 23,036 | 32 1/2 | 14,199 |
| 2008 | 15-10 | 31,523 | 23,642 | 33 1/2 | 14,357 |
| 2009 | 16-5 | 31,881 | 23,911 | 34 1/2 | 14,306 |
| 2010 | 16-6 | 32,819 | 24,614 | 35 1/2 | 14,509 |
| 2011 | 16-7 | 33,757 | 25,318 | 36 1/2 | 14,703 |

$499,953

37. The decedent's retirement is computed in Table I as if her 65th birthday would have occurred on June 30, 2011, rather than May 23, 2011. The expiration of the decedent's 52-year life expectancy is similarly computed in Table II, *infra*, as falling on June 30, 2023. (It is unclear whether the 52-year life expectancy stipulated to by the parties, *see* note 24, *supra*, was intended to run from the decedent's 25th birthday on May 23, 1971, or from the date of her death on June 7, 1971.)

## V

### Damages for Destruction of Capacity to Enjoy Life's Activities

There is more to life than earning a living. The capacity to earn money, although it "may well be the principal element of recovery resulting from [wrongful] death," is but part of the decedent's overall "capacity to carry on life's activities" for the destruction of which the decedent's representative is entitled to compensation. Floyd v. Fruit Industries, Inc., *supra,* 144 Conn. at 669–670, 136 A.2d at 924. Evidence of a decedent's "appearance, health, background, [and] education" is properly to be considered relative to whether the decedent would have lived a "pleasurable" as well as a "profitable" life, as where an untimely death has deprived the decedent "of an opportunity to take his place in the community, . . . and to rear a family." McKirdy v. Cascio, *supra,* 142 Conn. at 86, 111 A.2d at 558. "[E]vidence as to the decedent's hobbies and recreations [is] admissible and, to the extent that the proof warrant[s], [s]hould presumably operate to enhance the amount of the verdict." Floyd v. Fruit Industries, Inc., *supra,* 144 Conn. at 676, 136 A.2d at 927. Such evidence contributes to an " 'over-all picture of the decedent's activities,' " and has a "bearing on how 'pleasurable' the decedent's future might have been," thus enabling the trier of fact "to make an informed valuation of the total destruction of [the decedent's] capacity to carry on life's activities." Waldron v. Raccio, *supra,* Conn.L.J., July 9, 1974, at 8.

The decedent has already been credited with continued earning capacity during the years she expected to spend at home rearing children. But her estate is still due compensation for her loss of the capacity to enjoy the myriad activities life offers outside of working hours. There was evidence from her husband and from her friend Mr. Bourke that the decedent derived much pleasure from sports such as cycling, skiing, and tennis, from entertaining friends as a hostess and from being entertained herself, and from travelling with her spouse.

She was happy and well-adjusted, and attractive in appearance. She was in good health, and could expect to live out the 52 years remaining in her expected life span. *Cf.* note 24, *supra.* In addition to all this, she was by virtue of her education, her family background, and her marriage to a fellow professional in an extremely advantageous social and economic position. Her standard of living was likely to rise considerably over the course of her working life. See pages 1302–1303, *infra.* Hence, she was especially likely to derive joy and satisfaction from life.

A substantial award for the destruction of the decedent's capacity to enjoy life is clearly justified. However, since the Supreme court of Connecticut has intimated that damages for the destruction of earning capacity should be the "principal element of recovery" for the wrongful death of one "who earns a relatively large income," Floyd v. Fruit Industries, Inc., *supra,* 144 Conn. at 670, 136 A.2d at 924; see also Chase v. Fitzgerald, *supra,* 132 Conn. at 468–469, 45 A.2d 789, the award must be relatively conservative in view of the substantial award of damages for the destruction of Mrs. Feldman's future earning capacity. With these considerations in mind, and aware that the Court must undertake " 'to do justice as best it can, although of necessity crudely,' " Waldron v. Raccio, *supra,* Conn.L.J., July 9, 1974, at 8, quoting Lane v. United Electric Light & Water Co., 90 Conn. 35, 37, 96 A. 155 (1915), the Court awards $100,000 for the destruction of the decedent's capacity to enjoy life's activities.

### Damages for Conscious Pain and Suffering before Death

Ante-mortem damages flowing from the same tort as caused wrongful death must be recovered, if at all, in the same action as seeks recovery for the death itself. Floyd v. Fruit Industries, Inc., *supra,* 144 Conn. at 669, 136 A.2d 918; Conn.Gen.Stats. § 52–599. In an effort at proving such damages, the plaintiff submitted a report on the crash prepared by the National Transportation

Safety Bureau, which indicated that an intense fire began immediately upon impact and burned "to the point of near total destruction the upper portion of the fuselage and cabin area of the airplane."[38] Only two passengers and the co-pilot survived; two other crew members and 26 passengers perished. The accident was deemed survivable, since "the fuselage structure remained sufficiently intact to preclude the infliction of traumatic injuries to the occupants."[39] Over half of the non-surviving passengers were found near the rear door of the plane, which in the absence of the stewardess, who had been injured on impact, could not be opened without the passengers being able to read detailed instructions. All of the passengers killed in the disaster died of asphyxiation or burns or both.

The plaintiff also submitted excerpts from testimony given at the trial of Perry v. Allegheny Airlines, Inc., *supra*, by a survivor of the aircraft disaster in which the decedent herein lost her life. The defendant agreed to this manner of presenting the testimony. The survivor, Mr. Norman Kelly, anticipated the crash when he saw through the window that the plane was at an unusually low altitude. He cradled his head in his arms immediately before impact. After the crash the interior of the plane was pitch black; the right wing and the right-hand exterior of the plane were on fire. Mr. Kelly opened the emergency door over the right wing, which was located next to his seat on the plane. He was burned by a great rush of flame through the door and hurriedly shut it. He heard a voice call the passengers to the exit at the rear of the plane. Since the back of the plane was smoky and dark, Mr. Kelly decided to try the emergency door opposite his seat, opening over the left wing. The flames outside that door were less intense. One other passenger followed Mr. Kelly out the door, through the fire, and over the wing to safety. Within about a minute of their exit the left wing exploded.

The plaintiff's final submissions of evidence on the decedent's conscious pain and suffering and contemplation of death were the decedent's death certificate and the report of the autopsy performed on the decedent's remains. The death certificate indicated that death was "sudden," and attributed it to "Asphyxia due to inhalation of smoke and Carbon Monoxide; Second and Third Degree Flame Burns of Body."[40] The autopsy report noted that the body was extensively burned, with charring of the head, thorax, and extremities. No fractures of the skeleton were found, and the internal organs were normal, save for the lungs: these were congested and discolored, and showed the inhalation of black particulate matter. Although the skull was not fractured and the brain showed no abnormalities, "a slight amount of what appeared to be clotted blood, resembling bone marrow was present over the right parieto-occipital portion of the brain in the epidural space."[41] The report concluded that "The immediate cause of death was pulmonary edema and congestion, associated with smoke inhalation and extensive charring burns of the entire body."[42]

The evidence thus presented by the plaintiff, while laying a foundation for a finding that the decedent suffered prior to her death, fails to show the existence of any nexus between the evidence that many of the passengers remained conscious after impact and the crucial question whether the decedent was likewise conscious after impact. No evidence was presented as to the location within the fuselage at which the decedent's body was found. Were she found in the cluster of bodies at the rear of the plane, the inference would be strong

38. National Transportation Safety Board, Aircraft Accident Report: Allegheny Airlines, Inc., Allison Prop Jet Convair 340/440, N5832, New Haven, Connecticut, June 7, 1971 (1972), Plaintiff's Exhibit 6, at 1.

39. *Id.*, at 16–17.

40. Connecticut State Department of Health, "Certified Copy of Death Record: Nancy Hollander Feldman," Plaintiff's Exhibit 5.

41. "Autopsy Upon the Body of Nancy H. Feldman," Plaintiff's Exhibit 8, at 3.

42. *Id.*

that she retained consciousness after the impact, acted to save her life, and had to face the frustration of her efforts at survival in the darkness, smoke, and heat of the burning fuselage. Conversely, were she found in the area of her seat, the inference would be strong that the impact had rendered her unconscious by a blow to her head, causing the clotted blood noted in the autopsy, so that she was not aware of her impending death. Nor was any evidence presented from which the Court could fairly infer that the decedent was aware of the proximity of disaster in advance of the actual impact. Mr. Kelly was alert to the situation only because he was monitoring the plane's descent by looking out the window; the plane's attitude underwent no dramatic change indicative of disaster.

Based on the proof adduced specifically on this point and on the totality of the circumstances of this case, the Court concludes that it would be too speculative to award damages for Mrs. Feldman's conscious pain and suffering and contemplation of death.

## VI

*Deduction of Personal Living Expenses*

■ The total losses sustained by reason of the wrongful death of Mrs. Feldman amount to $599,953; $499,953 for the destruction of her future earning capacity and $100,000 for the destruction of her capacity to enjoy life's activities. Connecticut law demands, however, that this amount be reduced by the amount the decedent would have expended on personal living expenses had had she lived. "If we bear in mind the underlying survivorship theory of our law, it becomes obvious that if fair compensation is to be made for the loss incident to the total destruction, at death, of the capacity to carry on life's activities, then in the case of a decedent who was subject to the expense of maintaining himself there must be deducted from what would otherwise be fair compensation the reasonable expense of personal living during the probable duration of

his lifetime." Floyd v. Fruit Industries, Inc., *supra*, 144 Conn. at 673–674, 136 A.2d at 926.

*Decedent's Obligation of Self-Support*

■■ Since Connecticut law provides for the deduction of personal living expenses from damages otherwise recoverable for the destruction of earning capacity through wrongful death only "in the case of a decedent who was subject to the expense of maintaining himself," Floyd v. Fruit Industries, Inc., *supra*, 144 Conn. at 674, 136 A.2d at 926, a threshold question in the instant case is whether Mrs. Feldman was subject to the expense of maintaining herself. Most jurisdictions impose upon a husband a duty to support his spouse, enforceable by both civil and criminal sanctions. See, *e. g.*, Conn.Gen.Stats. §§ 46–10; 53–304. However, since this duty is generally subject to the implied or expressed limitation that only "reasonable" support be supplied by a husband, the Court does not feel that this duty exempts an income-earning wife in a dual-career marriage from an obligation to apportion a part of her income for her own support. To hold otherwise would be unnecessarily inconsistent with the trend of the law, both judicially and legislatively prescribed, toward according women equal social rights and obligations absent compelling circumstances urging the contrary. See Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). *Compare* Kahn v. Shevin, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974). Accordingly, the Court holds that the decedent herein was subject to the expense of maintaining herself.

*Calculations of the Parties*

The parties differed considerably in their definition and assessment of personal living expenses. The plaintiff deemed such expenses to be those required for "the necessary food, shelter, clothing and medicine that we both spent to keep ourselves going in

occupation." [43] Plaintiff estimated that the decedent's share of their personal living expenses in New Haven during the last year of her life amounted to $90 per month for rent and $20 per week for food, clothing, and medicine; these figures totalled $2,120 per year. Plaintiff's future earnings expert rounded this amount to $2,150. Under cross-examination, however, the plaintiff could ill-account for the $6,000 of income which his figure for personal living expenses left undisposed of from the approximately $10,000 of after tax income enjoyed by the couple in 1970. The plaintiff spoke vaguely of travel, entertainment, and unspecified savings and investments as consuming the rest of this income.

The defendant's expert used statistics compiled by the United States Department of Labor to arrive at a much different figure for personal living expenses. The basis for the defendant's calculations was the $16,345 total budget of a family of four, including two children, which in 1971 enjoyed a "higher level of living" in the metropolitan Washington area. Of this budget, $12,002 went for "consumption items such as food, housing, transportation, clothing, personal care, medical care, and family consumption," according to the report of the defendant's expert.[44] The Department of Labor determined that a couple without children would spend 49 per cent of the figure for a family of four; a single person living along would spend 35 per cent. The defendant's expert used the 35 per cent figure rather than one-half of the 49 per cent figure to derive a personal living expense sum of $4,200 per year. From this he subtracted $269 for recreational expenses, a figure derived from statistics showing that national recreational expenditures in 1971 accounted for 6.4 per cent of national personal consumption expenditures. The defendant's expert ended up with a sum of $3,931 as the decedent's probable net personal living expenses.

*Definition of Personal Living Expenses*

██ Both parties misperceived the proper ingredients of personal living expenses. The phrase "refers to those personal expenses which, *under the standard of living followed by a given decedent*, it would have been reasonably necessary for him to incur in order to keep himself in such a condition of health and well-being that he could maintain his *capacity* to enjoy life's activities, including the capacity to earn money." Floyd v. Fruit Industries, Inc., *supra*, 144 Conn. at 675, 136 A.2d at 926. (Emphasis added.) The plaintiff departs from this standard in seeking to have the decedent's personal living expenses calculated at a flat figure derived from the couple's final year in New Haven, notwithstanding the probability that the decedent's income and standard of living would have risen steadily and substantially during her career in Washington. However, the existence of a nexus between personal living expenses and standard of living does not mean, as the defendant would have it, that all expenses except for taxes, gifts, and narrowly defined "recreation" are incident to the maintenance of as high a standard of living as income will permit and hence are personal living expenses. Under the Connecticut rule, personal living expenses are those which cover the cost of maintaining the *capacity* to live well. Personal living expenses as so defined provide the setting for the precious gem of life, and while the cost of the setting may reflect the cost of the gem, it does not include it. Thus the Court concludes that the personal living expenses deductible herein are the expenses, at a level appropriate to the decedent's standard of living, for the basic necessities of life: food, shelter, clothing, health care. These basic necessities are generally satisfied in decreasingly Spartan fashion as a person's available income rises; this circumstance must be taken into consideration. Moreover, the amount expended on basic necessities is often directly

---

43. R.T. at 80.

44. Defendant's Exhibit F, *supra* note 29, at 4–5.

related to earning capacity, especially in a personality-oriented professional career where living style may be an attribute of success. Thus in assuming a professional's rising earning capacity, it must also be assumed that expenditures for basic necessities will rise commensurately.

### Assessment of Decedent's Personal Living Expenses

The $2,120 per year which the plaintiff testified to as his estimation of the decedent's personal living expenses in New Haven was revealed under cross-examination as unduly conservative in regard to clothing and to food. Plaintiff's expert took a cautious view of this evidence, increasing it to the rounder number of $2,150. The Court goes a step further, and adopts the still rounder figure of $2,200 as a credible estimate of the decedent's ante-mortem level of personal living expenses. The plaintiff admitted, however, that higher living costs could be expected in Washington, at least as to some items. Moreover, the Court has concluded that the decedent would have secured employment in Washington at a starting salary 50 per cent over that she was receiving in New Haven, and would receive annual increases thereafter averaging slightly over three per cent. See pages 1285–1286, *supra*. It would seem that at least half of the initial salary differential is reasonably attributable to higher living costs in Washington, and hence the decedent's personal living expenses for her first year in Washington may fairly be set at 25 per cent above her last year in New Haven. Thereafter, percentage increases in personal living expenses approximating similar percentage increases in earning capacity will serve to satisfy the Connecticut requirement for an appropriate deduction from the value of earning capacity to represent the cost of maintaining that capacity. Thus, the decedent's probable personal living expenses are set at $2,750 for her first year in Washington, that amount to be increased by three per cent for each year thereafter in which she has been credited with an increase in earning capacity.[45]

■ Surprisingly, not only the plaintiff but also the defendant treated personal living expenses solely as an item to be deducted from year-by-year valuations of the decedent's lost future earning capacity. Thus both parties made allowance for personal living expenses by deducting them, in the same manner as future income taxes, from the gross value of each year's lost future earning capacity. This method of calculation ignores the fact that what is to be deducted from "what would otherwise be fair compensation" is "the reasonable expense of personal living *during the probable duration of [the decedent's]*

45. The $2,750 figure for the decedent's personal living costs during her first year in Washington, derived by the Court by increasing by 25 per cent the $2,200 figure estimated for the decedent's personal living expenses during her last year in New Haven, compares very favorably with the defendant's expert's calculations when one factor in those calculations is adjusted. The defendant's expert based his calculations on the estimated expenditures of a family of four in the Washington area for a "higher" level of living. *See* page 1302, *supra*. To reduce the figure applicable to a family of four to one applicable to decedent alone, a factor of .35 was used. This factor of .35 is prescribed by government statisticians for use in determining the expenditures of a single person living alone. The prescribed factor for determining the expenditures of two persons living together is .49 of the family-of-four figure. Since the decedent would

have been living with her husband and have enjoyed consequent economies of scale, the appropriate factor for the defendant's expert to have used was one-half of the .49 factor, or .245. Had the defendant's expert used a .245 factor, but otherwise made the same assumptions, he would have derived a personal living expenses figure for the decedent of $2,750.06. This figure is obtained by multiplying the $12,002 base figure by .245, resulting in a product of $2,940.49. From this must be subtracted a recreational expense adjustment. The defendant's expert used a figure of .064, representing the percentage of national personal consumption spent for recreation. This percentage must be multiplied by the .245 factor, yielding a revised factor of .0167, by which the $12,002 base figure is again multiplied. This produces a figure of $190.43, which when subtracted from $2,940.49 yields a net personal living expenses figure of $2,750.06.

*lifetime."* Floyd v. Fruit Industries, Inc., *supra,* 144 Conn. at 674, 136 A.2d at 926 (emphasis added). The decedent had before her at the time of her death a probable life span of 52 more years, of which only 40 were working years. See note 24, *supra.* The Court is required to deduct from the damages heretofore assessed the decedent's personal living expenses during her 12 years of retirement as well as during her working life.

■ In assessing the decedent's personal living expenses during her working years, the Court has recognized that "the amount expended on basic necessities is often directly related to earning capacity." Page 1302, *supra.* Thus it would not be fair to assess the decedent's personal living expenses during retirement at the same maximum level which they would have reached in her last year prior to retirement, when she has been credited with her highest earning capacity. On the other hand, it cannot reasonably be assumed that a person accustomed to an affluent standard of living will upon retirement and the cessation of current income revert to living on the proverbial shoestring. While this is the current lot of many of the nation's aged, the earning capacity with which the decedent has been credited and the favorable social and economic circumstances in which she could be expected to have lived out her life are such that it may fairly be assumed that the decedent would have made adequate provision for her years in retirement. Thus her personal living expenses during these years must be put at a level high enough to be consistent with a continued high standard of living, while nevertheless reflecting the absence of the necessity to maintain a high earning capacity. The Court accordingly sets the decedent's personal living expenses during retirement at $5,000 per year, a convenient figure which is approximately one-quarter less than the personal living expenses assessed for the decedent's year of maximum earning capacity.

*Discounting of Personal Living Expenses to Present Value*

■ Connecticut law is unclear on whether personal living expenses are to be discounted to present value. The Court believes that logic and justice alike require that since the decedent's estate is to receive only the present value of her lost future earning capacity, there should be charged against that only the present value of her future personal living expenses. The purpose of discounting the future earning capacity values is to insure that the lump sum of damages is no more than is necessary, when the earning power of money is considered, to provide the sums which the decedent was capable of receiving "at periodic times in the future." Chase v. Fitzgerald, *supra,* 132 Conn. at 470, 45 A.2d at 793. But personal living expenses too are sums to be paid "at periodic times in the future." To deduct from the present value of damages to which the decedent has been found to be entitled the full amount of an expenditure which would not have been incurred by the decedent until a future time, would have the effect of magnifying the proportion of the decedent's future earning capacity which would have been consumed by personal living expenditures.

The parties achieved the proper result of discounting to present value the decedent's personal living expenses by deducting those expenses from each year's value for lost earning capacity *before* discounting that value to present worth. The same result may be achieved more directly by discounting the yearly figures assessed for personal living expenses, and deducting the sum of these discounted figures from the losses sustained by the decedent, which of course include the sum of the discounted future earning capacity figures. This latter method is in any event necessary to discount the personal living expenses assessed for the years of retirement in which the decedent has been deemed to have no earning capacity, and so it is this method which has been used for all

52 years for which the decedent's personal living expenses have been computed. The total amount of the deduction for Mrs. Feldman's personal living expenses is accordingly set forth in Table II.

T A B L E II
Computation of Deduction for Personal Living Expenses

| Fiscal year ending June 30, | Personal living expenses | Discounted at 1.5% for (years) | Present value on July 1, 1974 |
|---|---|---|---|
| 1972 | $2750 | -0- | $2750 |
| 1973 | 2833 | -0- | 2833 |
| 1974 | 2917 | -0- | 2917 |
| 1975 | 3005 | 1/2 | 2983 |
| 1976 | 3095 | 1 1/2 | 3027 |
| 1977 | 3095 | 2 1/2 | 2982 |
| 1978 | 3095 | 3 1/2 | 2938 |
| 1979 | 3095 | 4 1/2 | 2894 |
| 1980 | 3095 | 5 1/2 | 2852 |
| 1981 | 3095 | 6 1/2 | 2809 |
| 1982 | 3095 | 7 1/2 | 2768 |
| 1983 | 3095 | 8 1/2 | 2727 |
| 1984 | 3095 | 9 1/2 | 2687 |
| 1985 | 3095 | 10 1/2 | 2647 |
| 1986 | 3188 | 11 1/2 | 2686 |
| 1987 | 3284 | 12 1/2 | 2726 |
| 1988 | 3382 | 13 1/2 | 2766 |
| 1989 | 3484 | 14 1/2 | 2807 |
| 1990 | 3588 | 15 1/2 | 2849 |
| 1991 | 3696 | 16 1/2 | 2891 |
| 1992 | 3807 | 17 1/2 | 2934 |
| 1993 | 3921 | 18 1/2 | 2977 |
| 1994 | 4038 | 19 1/2 | 3020 |
| 1995 | 4160 | 20 1/2 | 3066 |
| 1996 | 4284 | 21 1/2 | 3110 |
| 1997 | 4413 | 22 1/2 | 3157 |
| 1998 | 4545 | 23 1/2 | 3203 |
| 1999 | 4682 | 24 1/2 | 3251 |
| 2000 | 4822 | 25 1/2 | 3299 |
| 2001 | 4967 | 26 1/2 | 3348 |
| 2002 | 5116 | 27 1/2 | 3397 |
| 2003 | 5269 | 28 1/2 | 3447 |
| 2004 | 5427 | 29 1/2 | 3498 |
| 2005 | 5590 | 30 1/2 | 3550 |
| 2006 | 5758 | 31 1/2 | 3602 |
| 2007 | 5931 | 32 1/2 | 3656 |
| 2008 | 6109 | 33 1/2 | 3710 |
| 2009 | 6292 | 34 1/2 | 3764 |
| 2010 | 6481 | 35 1/2 | 3820 |
| 2011 | 6675 | 36 1/2 | 3876 |
| 2012 | 5000 | 37 1/2 | 2861 |
| 2013 | 5000 | 38 1/2 | 2818 |
| 2014 | 5000 | 39 1/2 | 2777 |
| 2015 | 5000 | 40 1/2 | 2736 |
| 2016 | 5000 | 41 1/2 | 2695 |
| 2017 | 5000 | 42 1/2 | 2656 |
| 2018 | 5000 | 43 1/2 | 2616 |
| 2019 | 5000 | 44 1/2 | 2578 |
| 2020 | 5000 | 45 1/2 | 2540 |
| 2021 | 5000 | 46 1/2 | 2502 |
| 2022 | 5000 | 47 1/2 | 2465 |
| 2023 | 5000 | 48 1/2 | 2429 |
| | | | $155,897 |

*Award of Net Damages*

██ The net amount of the damages to which the plaintiff is entitled is thus $499,953 for the destruction of future earning capacity (Table I, *supra*), plus $100,000 for the destruction of the capacity to enjoy life's activities, less $155,897 for the personal living expenses which the decedent would have incurred (Table II, *supra*), which equals $444,056.

In addition to "just damages," the Connecticut wrongful death statute provides for the recovery of funeral expenses. Conn.Gen.Stats. § 52–555. Although funeral expenses were claimed in the complaint, no evidence of their amount was adduced at trial. Accordingly, no funeral expenses are awarded.

*Dismissal of Plaintiff's Personal Cause of Action*

██ Besides suing as the administrator of the estate of the decedent, the plaintiff also purports to sue on his own behalf for loss of consortium and companionship and other unspecified damages. No such cause of action exists under Connecticut law, which makes a wrongful death action on behalf of the decedent the sole vehicle for the recovery—at least by intestate successors of the decedent—of post-mortem damages resulting from the death of the decedent. Foran v. Carangelo, 153 Conn. 356, 359–362, 216 A.2d 638 (1966); Chase v. Fitzgerald, *supra*, 132 Conn. at 467, 45 A.2d 789. It is accordingly ordered that the plaintiff's suit on his own behalf be dismissed with prejudice.

The Court having found $444,056 to be just damages for the wrongful death of Nancy Hollander Feldman, it is ordered that judgment enter in that amount against the defendant, on behalf of the plaintiff as the administrator of the estate of the decedent.

So ordered.

APPENDIX

The deflator used throughout the Appendix is the Consumer Price Index (CPI). This was the deflator used by the parties' experts in their respective comments on inflation. Moreover, as opposed to such other deflators as the Wholesale Price Index and the GNP Deflator, the CPI, which is based on retail prices for goods and services purchased by urban wage earners and clerical workers, seemed most relevant to the effect of inflation under study herein—the effect on the purchasing power of an individual urban professional. The Court recognizes that the CPI is currently under revision in response to criticism of its accuracy. See generally, "Serious flaws in the popular price indexes," *Business Week,* April 27, 1974, at 86–91. But the fact remains that the CPI has been deemed sufficiently reliable by officials of government, labor, and management to be tied directly to the incomes of 50 million Social Security and food stamp recipients, government pensioners, and workers. See "The deceptive lure of indexation," *Business Week,* May 25, 1974, at 147. Compared to the billions of dollars thus distributed through escalation clauses tied to the CPI, the sums to be discounted herein are paltry indeed, and in the absence of any more accurate deflator suitable for the task, the Court feels it is reasonable to use the CPI to determine an inflation-adjusted discount rate. Of course, improvements in the CPI effected subsequently to this case must be considered—along with the Court's disavowal of any claim to economic expertise—in assessing the continuing validity of the calculations herein and their applicability to circumstances other than those before this Court in this case.

Data on CPI levels were obtained from the 1974 Economic Report of the President (1974 ERP), at 300, Table C–44. In order to conform to the models' assumptions that investments were made on the first day of each year, the CPI

figures in all the tables of the Appendix were adjusted to reflect the approximate level on January 1 of each year, instead of the figure listed in the 1974 ERP— the average level for the entire year. This adjustment was performed by taking the average of the CPI's annual average figures for two successive years. Thus, where Table A–I shows the CPI on January 1, 1962, to be 90.1, this represents the two-year average of the 1961 annual average CPI figure of 89.6, and the 1962 annual average CPI figure of 90.6. The January 1, 1974, CPI figure of 139.0 was derived by extrapolation from the December 1973 figure of 138.5 provided by the 1974 ERP.[1]

Data on interest rates were obtained from the 1974 ERP, at 317, Table C–58, which gives, *inter alia*, annual average yields on three-month Treasury bills for every year from 1929 through 1973 (Tables A–I and A–II), on three-to-five-year notes and bonds for every year from 1939 through 1973 (Table A–III), and on ten-to-fifteen-year taxable bonds for every year from 1942 through 1973 (Table A–IV).[2] Since year-to-year changes in average annual government obligation yields have been considerably more irregular than the general upward curve of the CPI, no effort was made to adjust the figure for annual average yields to produce figures applicable specifically to the first day of each year.

Table A–I computes the effective annual yield, after inflation, or "real yield," of one (1) unit invested on the first day of every year from 1940 through 1973, with interest paid at the annual average rate for each year of three-month Treasury bills, and with the entire principal and interest reinvested in the same fashion for each succeeding year through 1973.[3]

An illustrative reading of the first line of Table A–I, starting with the left-hand column, reveals the following: Had $1,000 been invested in accordance with the model's assumptions on January 1, 1940, it would have been worth $2,344.06 on January 1, 1974, for a net yield of $1,344.06, or 134 per cent, which when divided by the 34-year term of the investment is an annual yield of 3.95 per cent per year. But on January 1, 1974, the CPI was 233 per cent above its level on January 1, 1940, having increased an average of 6.84 per cent

---

1. Since the tables of the Appendix were compiled, 1974 monthly CPI averages were obtained by the Court in a telephone interview with Mr. M. P. Jackman, Chief Economist, Office of Consumer Prices, Bureau of Labor Statistics, United States Department of Labor. These figures are as follows:

| | |
|---|---|
| January 1974 | 139.7 |
| February 1974 | 141.5 |
| March 1974 | 143.1 |
| April 1974 | 144.2 |
| May 1974 | 145.6 |

The average of the December 1973 and January 1974 monthly CPI averages yields the more accurate figure of 139.1 for the CPI as of January 1, 1974.

2. The yields on long-term taxable bonds were based on fifteen-year bonds through March 1952, on twelve-year bonds from April 1952 through March 1953, and on ten-year bonds thereafter. 1974 ERP, at 318, Table C–58, n. 4.

3. It should be noted that Tables A–I and A–II assume that the investment made on the first day of each year was compounded *annually* thereafter. A continually reinvested investment in three-month Treasury bills would actually be compounded *quarterly*, i. e., the four times a year when each set of three-month bills would be redeemed and its principal and interest reinvested in another set of three-month bills. The point of the model was not to replicate exactly the yield on continually reinvested three-month Treasury bills, which because of their large denominations are hardly a practicable means of reinvesting the interest on anything but a huge investment, but rather to examine the yield on a hypothetical investment instrument which offered annual compounding at the rate of return contemporaneously offered on three-month Treasury bills, which rate of return was the sort of "risk-free" rate of return which the parties to this case agreed was the standard to be used in setting a discount rate.

per year. The hypothetical investor thus lost an average of 2.9 per cent per year in the purchasing power of his invested money. While the investor had $2,334.-06 on January 1, 1974, instead of the $1,000 he had on January 1, 1940, he needed $3,330 on January 1, 1974, to buy what his $1,000 could have purchased on January 1, 1940.

Table A–II was compiled on the basis of the same data and methodology as was Table A–I, but covers only the period of relatively low and stable inflation from 1952 through 1966.

Table A–III computes the real yield of one (1) unit invested for a term of ten to fifteen years on the first day of every year from 1942 through 1964, with interest paid and compounded annually at the annual average rate of interest paid on long-term (ten to fifteen years) taxable government bonds purchased in the year in which the investment was assumed to have been made.[4]

Table A–IV computes the real yield after inflation of one (1) unit invested for a term of three years on the first day of every year from 1940 through 1971, with interest paid and compounded annually at the annual average rate of interest paid on short-term (three to five years) taxable government notes and bonds purchased in the year in which the investment was assumed to have been made.[5]

Tables A–III and A–IV differ from Tables A–I and A–II in that the investments within each model were assumed to have been held for approximately the same length of time, as determined by the term of the government securities upon the yield of which the model was based. Thus all investments in Table A–III were assumed to have been held for between ten and fifteen years, and all investments in Table A–IV were assumed to have been held for three years. This allows direct comparison between the real yields of similar investments held for the same length of time during periods of differing rates of inflation.

4. As with the Treasury bill model, the point of the long-term bond model (Table A–III) and the short-term note model (Table A–IV) was not to replicate exactly actual investments but rather to examine the real yields on hypothetical investments offering the yields obtainable on sophisticated forms of government debt and, in the case of notes and bonds, subject to the constraint of having that yield fixed for the term of the bond. Annual compounding was made a feature of the notes and bonds models in order to avoid understating their effective return. Marginally higher returns yet might have been achieved by compounding each year's interest payment at some rate of interest prevailing at the time of the compounding, rather than at the rate of interest at which the bond was sold. But this would have introduced into the model a level of complexity with which the Court was not prepared to cope absent a more compelling reason therefor.

5. *See* note 4 of this Appendix, *supra.*

## T A B L E A - I
### Treasury Bill Model 1940-1974

| Value on Jan. 1, 1974 of 1 invested on Jan. 1, .... | Effective annual interest | CPI on date of invest- ment (Jan. 1, 1974 = 139.0) | % change in CPI | Average annual % change in CPI | Effective annual interest less aver- age annual % change in CPI |
|---|---|---|---|---|---|
| 1940 - 2.34406 | 3.95 | 41.8 | 233 | 6.84 | -2.9 |
| 1941 - 2.34373 | 4.07 | 43.1 | 223 | 6.74 | -2.7 |
| 1942 - 2.34132 | 4.19 | 46.5 | 199 | 6.21 | -2.0 |
| 1943 - 2.33371 | 4.30 | 50.4 | 176 | 5.67 | -1.4 |
| 1944 - 2.32504 | 4.42 | 52.3 | 166 | 5.53 | -1.1 |
| 1945 - 2.31635 | 4.54 | 53.3 | 161 | 5.54 | -1.0 |
| 1946 - 2.30770 | 4.67 | 56.2 | 147 | 5.26 | - .6 |
| 1947 - 2.29908 | 4.81 | 62.7 | 122 | 4.51 | .3 |
| 1948 - 2.28550 | 4.94 | 69.5 | 100 | 3.85 | 1.1 |
| 1949 - 2.26198 | 5.05 | 71.7 | 93.9 | 3.75 | 1.3 |
| 1950 - 2.23732 | 5.16 | 71.8 | 93.6 | 3.90 | 1.3 |
| 1951 - 2.21040 | 5.26 | 75.0 | 85.3 | 3.71 | 1.6 |
| 1952 - 2.17662 | 5.35 | 78.7 | 76.6 | 3.48 | 1.9 |
| 1953 - 2.13885 | 5.42 | 79.8 | 74.2 | 3.53 | 1.9 |
| 1954 - 2.09833 | 5.49 | 80.3 | 73.1 | 3.66 | 1.8 |
| 1955 - 2.07852 | 5.68 | 80.3 | 73.1 | 3.85 | 1.8 |
| 1956 - 2.04271 | 5.79 | 80.8 | 72.0 | 4.00 | 1.8 |
| 1957 - 1.98982 | 5.82 | 82.4 | 68.7 | 4.04 | 1.8 |
| 1958 - 1.92687 | 5.79 | 85.5 | 62.6 | 3.91 | 1:9 |
| 1959 - 1.89208 | 5.95 | 87.0 | 59.8 | 3.98 | 2.0 |
| 1960 - 1.82977 | 5.93 | 88.0 | 58.0 | 4.14 | 1.8 |
| 1961 - 1.77772 | 5.98 | 89.2 | 55.8 | 4.29 | 1.7 |
| 1962 - 1.73643 | 6.14 | 90.1 | 54.3 | 4.52 | 1.6 |
| 1963 - 1.68949 | 6.27 | 91.2 | 52.4 | 4.76 | 1.5 |
| 1964 - 1.63779 | 6.38 | 92.3 | 50.6 | 5.06 | 1.3 |
| 1965 - 1.58166 | 6.46 | 93.7 | 48.3 | 5.37 | 1.1 |
| 1966 - 1.52150 | 6.52 | 95.9 | 44.9 | 5.62 | .9 |
| 1967 - 1.45069 | 6.44 | 98.6 | 41.0 | 5.85 | .6 |
| 1968 - 1.39060 | 6.51 | 102.1 | 36.1 | 6.02 | .5 |
| 1969 - 1.32012 | 6.40 | 107.0 | 29.9 | 5.98 | .4 |
| 1970 - 1.23749 | 5.94 | 113.1 | 22.9 | 5.73 | .2 |
| 1971 - 1.16242 | 5.41 | 118.5 | 17.3 | 5.77 | - .4 |
| 1972 - 1.11399 | 5.70 | 123.3 | 12.7 | 6.37 | - .7 |
| 1973 - 1.07410 | 7.41 | 127.5 | 9.02 | 9.02 | -1.6 |

Selected averages
| | |
|---|---|
| 1969 - 1973: | - .4 |
| 1964 - 1973: | .2 |
| 1959 - 1973: | .7 |
| 1954 - 1973: | 1.0 |
| 1949 - 1973: | 1.1 |
| 1944 - 1973: | .9 |
| 1940 - 1973: | .5 |

T A B L E A - II
Treasury Bill Model 1952-1967

| Value on Jan. 1, 1967 of 1 invested on Jan. 1, .... | Effective annual interest | CPI on date of invest- ment (Jan. 1, 1967 = 98.6) | % change in CPI | Average annual % change in CPI | Effective annual interest less aver- age annual % change in CPI |
|---|---|---|---|---|---|
| 1952 - 1.50040 | 3.34 | 78.7 | 25.3 | 1.68 | 1.7 |
| 1953 - 1.47437 | 3.39 | 79.8 | 23.6 | 1.68 | 1.7 |
| 1954 - 1.44644 | 3.43 | 80.3 | 22.8 | 1.75 | 1.7 |
| 1955 - 1.43278 | 3.61 | 80.3 | 22.8 | 1.90 | 1.7 |
| 1956 - 1.40810 | 3.71 | 80.8 | 22.0 | 2.00 | 1.7 |
| 1957 - 1.37164 | 3.72 | 82.4 | 18.9 | 1.89 | 1.8 |
| 1958 - 1.32825 | 3.65 | 85.5 | 15.3 | 1.70 | 2.0 |
| 1959 - 1.30426 | 3.80 | 87.0 | 13.3 | 1.67 | 2.1 |
| 1960 - 1.26131 | 3.73 | 88.0 | 12.0 | 1.72 | 2.0 |
| 1961 - 1.22543 | 3.76 | 89.2 | 10.5 | 1.76 | 2.0 |
| 1962 - 1.19697 | 3.94 | 90.1 | 9.43 | 1.89 | 2.1 |
| 1963 - 1.16461 | 4.12 | 91.2 | 8.11 | 2.03 | 2.1 |
| 1964 - 1.12898 | 4.30 | 92.3 | 6.83 | 2.28 | 2.0 |
| 1965 - 1.09028 | 4.51 | 93.7 | 5.23 | 2.61 | 1.9 |
| 1966 - 1.04881 | 4.88 | 95.9 | 2.82 | 2.82 | 2.1 |

Selected averages
1952 - 1966: 1.9
1957 - 1966: 2.0
1962 - 1966: 2.0

# T A B L E A - III
## 10-15 Year Federal Bond Model

| Bond purchased 1st day of... / Matures 1st day of... | CPI at maturity | CPI at issue | % change in CPI | Term of bond | Average annual % change in CPI | Annual yield of bond in % of principal | Total yield of bond, with interest compounded at original rate | Effective annual interest | Effective annual interest less average annual % change in CPI |
|---|---|---|---|---|---|---|---|---|---|
| 1942-57 | 82.4 | 46.5 | 77.2 | 15 | 5.15 | 2.46 | 440 | 2.93 | -2.2 |
| 1943-58 | 85.5 | 50.4 | 69.6 | 15 | 4.64 | 2.47 | 442 | 2.95 | -1.7 |
| 1944-59 | 87.0 | 52.3 | 66.3 | 15 | 4.42 | 2.48 | 444 | 2.96 | -1.5 |
| 1945-60 | 88.0 | 53.3 | 62.7 | 15 | 4.18 | 2.37 | 421 | 2.81 | -1.4 |
| 1946-61 | 89.2 | 56.2 | 58.7 | 15 | 3.91 | 2.19 | 384 | 2.56 | -1.4 |
| 1947-62 | 90.1 | 62.7 | 43.7 | 15 | 2.91 | 2.25 | .396 | 2.64 | - .3 |
| 1948-63 | 91.2 | 69.5 | 31.2 | 15 | 2.08 | 2.44 | 440 | 2.93 | .9 |
| 1949-64 | 92.3 | 71.7 | 28.7 | 15 | 1.91 | 2.31 | 408 | 2.72 | .8 |
| 1950-65 | 93.7 | 71.8 | 30.5 | 15 | 2.03 | 2.32 | 411 | 2.74 | .7 |
| 1951-66 | 95.9 | 75.0 | 27.9 | 15 | 1.86 | 2.57 | 463 | 3.09 | 1.2 |
| 1952-64 | 92.3 | 78.7 | 17.2 | 12 | 1.44 | 2.68 | 374 | 3.12 | 1.7 |
| 1953-63 | 91.2 | 79.8 | 14.3 | 10 | 1.43 | 2.94 | 336 | 3.36 | 1.9 |
| 1954-64 | 92.3 | 80.3 | 14.9 | 10 | 1.49 | 2.55 | 287 | 2.87 | 1.4 |
| 1955-65 | 93.7 | 80.3 | 16.7 | 10 | 1.67 | 2.84 | 323 | 3.23 | 1.6 |
| 1956-66 | 95.9 | 80.8 | 18.7 | 10 | 1.87 | 3.08 | 354 | 3.54 | 1.7 |
| 1957-67 | 98.6 | 82.4 | 19.6 | 10 | 1.96 | 3.47 | 407 | 4.07 | 2.1 |
| 1958-68 | 102.1 | 85.5 | 19.4 | 10 | 1.94 | 3.43 | 401 | 4.01 | 2.1 |
| 1959-69 | 107.0 | 87.0 | 23.0 | 10 | 2.30 | 4.07 | 491 | 4.91 | 2.6 |
| 1960-70 | 113.1 | 88.0 | 28.5 | 10 | 2.85 | 4.01 | 482 | 4.82 | 2.0 |
| 1961-71 | 118.5 | 89.2 | 32.8 | 10 | 3.28 | 3.90 | 466 | 4.66 | 1.4 |
| 1962-72 | 123.3 | 90.1 | 36.8 | 10 | 3.68 | 3.95 | 474 | 4.74 | 1.1 |
| 1963-73 | 127.5 | 91.2 | 39.8 | 10 | 3.98 | 4.00 | 480 | 4.80 | .8 |
| 1964-74 | 139.0 | 92.3 | 50.6 | 10 | 5.06 | 4.15 | 502 | 5.02 | .0 |

Selected averages
1960 - 1964: 1.0
1955 - 1964: 1.5
1950 - 1964: 1.5
1945 - 1964: 1.0
1942 - 1964: 0.7
1952 - 1956: 1.6

T A B L E A - IV
3-5 Year Federal Note Model

| Note purchased 1st day of . . . / Matures 1st day of . . . | CPI at maturity | CPI at issue | % change in CPI | Term of note | Average annual % change in CPI | Annual yield of note in % of principal | Total yield of note, with interest compounded at original rate | Effective annual interest | Effective annual interest less average annual % change in CPI |
|---|---|---|---|---|---|---|---|---|---|
| 1940-43 | 50.4 | 41.8 | 20.6 | 3 | 6.86 | .50 | .0151 | .50 | -6.4 |
| 1941-44 | 52.3 | 43.1 | 21.3 | 3 | 7.12 | .73 | .0221 | .74 | -6.4 |
| 1942-45 | 53.3 | 46.5 | 14.6 | 3 | 4.87 | 1.46 | .0444 | 1.48 | -3.4 |
| 1943-46 | 56.2 | 50.4 | 11.5 | 3 | 3.84 | 1.34 | .0407 | 1.36 | -2.5 |
| 1944-47 | 62.7 | 52.3 | 19.9 | 3 | 6.63 | 1.33 | .0406 | 1.35 | -5.3 |
| 1945-48 | 69.5 | 53.3 | 30.4 | 3 | 10.1 | 1.18 | .0358 | 1.19 | -8.9 |
| 1946-49 | 71.7 | 56.2 | 27.6 | 3 | 9.19 | 1.16 | .0352 | 1.17 | -8.0 |
| 1947-50 | 71.8 | 62.7 | 14.5 | 3 | 4.84 | 1.32 | .0401 | 1.34 | -3.5 |
| 1948-51 | 75.0 | 69.5 | 7.91 | 3 | 2.63 | 1.62 | .0494 | 1.65 | -1.0 |
| 1949-52 | 78.7 | 71.7 | 9.76 | 3 | 3.25 | 1.43 | .0435 | 1.45 | -1.8 |
| 1950-53 | 79.8 | 71.8 | 11.1 | 3 | 3.71 | 1.50 | .0457 | 1.52 | -2.2 |
| 1951-54 | 80.3 | 75.0 | 7.07 | 3 | 2.36 | 1.93 | .0590 | 1.97 | - .4 |
| 1952-55 | 80.3 | 78.7 | 2.03 | 3 | 0.678 | 2.13 | .0653 | 2.18 | 1.5 |
| 1953-56 | 80.8 | 79.8 | 1.25 | 3 | 0.418 | 2.56 | .0788 | 2.63 | 2.2 |
| 1954-57 | 82.4 | 80.3 | 2.62 | 3 | 0.872 | 1.82 | .0556 | 1.85 | 1.0 |
| 1955-58 | 85.5 | 80.3 | 6.48 | 3 | 2.16 | 2.50 | .0769 | 2.56 | .4 |
| 1956-59 | 87.0 | 80.8 | 7.67 | 3 | 2.56 | 3.12 | .0966 | 3.22 | .7 |
| 1957-60 | 88.0 | 82.4 | 6.80 | 3 | 2.27 | 3.62 | .113 | 3.75 | 1.5 |
| 1958-61 | 89.2 | 85.5 | 4.33 | 3 | 1.44 | 2.90 | .0895 | 2.98 | 1.5 |
| 1959-62 | 90.1 | 87.0 | 3.56 | 3 | 1.19 | 4.33 | .136 | 4.52 | 3.3 |
| 1960-63 | 91.2 | 88.0 | 3.64 | 3 | 1.21 | 3.99 | .125 | 4.15 | 2.9 |
| 1961-64 | 92.3 | 89.2 | 3.01 | 3 | 1.00 | 3.60 | .112 | 3.73 | 2.7 |
| 1962-65 | 93.7 | 90.1 | 4.00 | 3 | 1.33 | 3.57 | .111 | 3.70 | 2.4 |
| 1963-66 | 95.9 | 91.2 | 5.15 | 3 | 1.72 | 3.72 | .116 | 3.87 | 2.2 |
| 1964-67 | 98.6 | 92.3 | 6.83 | 3 | 2.28 | 4.06 | .127 | 4.23 | 2.0 |
| 1965-68 | 102.1 | 93.7 | 8.96 | 3 | 2.99 | 4.22 | .132 | 4.40 | 1.4 |
| 1966-69 | 107.0 | 95.9 | 11.6 | 3 | 3.86 | 5.16 | .163 | 5.43 | 1.6 |
| 1967-70 | 113.1 | 98.6 | 14.7 | 3 | 4.90 | 5.07 | .160 | 5.33 | .4 |
| 1968-71 | 118.5 | 102.1 | 16.1 | 3 | 5.35 | 5.59 | .177 | 5.91 | - .6 |
| 1969-72 | 123.3 | 107.0 | 15.2 | 3 | 5.08 | 6.85 | .220 | 7.33 | 2.3 |
| 1970-73 | 127.5 | 113.1 | 12.7 | 3 | 4.24 | 7.37 | .238 | 7.93 | 3.7 |
| 1971-74 | 139.0 | 118.5 | 17.3 | 3 | 5.77 | 5.77 | .183 | 6.11 | 0.3 |

Selected averages:

| | |
|---|---|
| 1967 - 1971: | 1.2 |
| 1962 - 1971: | 1.6 |
| 1957 - 1971: | 1.8 |
| 1952 - 1971: | 1.7 |
| 1947 - 1971: | 1.0 |
| 1942 - 1971: | - .1 |
| 1940 - 1971: | - .5 |
| 1952 - 1966: | 1.8 |
| 1952 - 1961: | 1.8 |